COOK et al., Appellants,

v.

CLEVELAND ELECTRIC ILLUMINATING COMPANY, Appellee.

[Cite as *Cook v. Cleveland Elec. Illum. Co.* (1995), 102 Ohio App.3d 417.]

Court of Appeals of Ohio,
Eighth District,
Cuyahoga County.

No. 67264.

Decided April 10, 1995.

418

*Richard C. Alkire, Joel Levin* and *Sandra J. Rosenthal,* for appellants.

*William F. Scully, Jr.,* for appellee.

---

DONALD C. NUGENT, Judge.

This is an appeal from a grant of summary judgment by the Cuyahoga County Court of Common Pleas on the intentional tort and loss of consortium claims of plaintiffs-appellants Ed Cook and Denise Cook, arising out of an electrical shock and explosion suffered by Ed Cook while he was in the employment of defendant-appellee Schloss Paving, Inc.[1] In their amended complaint, appellants allege that appellee Schloss Paving knew that harm was substantially certain to result because appellant Ed Cook was required to work in an electrical equipment room that had been "wired by a non-licensed and unqualified worker and which it knew was wired contrary to standards outlined in the National Electric Code Guidelines."

The following relevant facts are derived from the evidence adduced by the parties upon discovery. This evidence consisted of affidavits, depositions, photographs and expert investigation reports in support of, and in opposition to, appellee's motion for summary judgment.

Appellee, Schloss Paving, Inc., is a paving contractor. On the morning of July 2, 1991, appellant Ed Cook was working as a "bin man" in the course and scope of his employment with appellee. As part of his regular job duties, appellant was required to operate the power transfer system at the end of his shift. Due to rising electricity costs from CEI, appellee introduced an on-site generator ("Gen Set") to fulfill the needs of the plant during normal plant hours. The power transfer system at appellee's plant was designed and installed by the plant superintendent, Thomas Thompson, in 1987 or 1988. During night hours, when the electrical demand for the plant was low, the power was switched to CEI power by turning off the generator and then switching the power supply to CEI service.

The power transfer system was housed in a block house. Next to the block house was the on-site generator. The transfer system was designed to switch the power at appellee's plant from the on-site generator to the outside power lines of CEI. CEI supplied power to the plant through a service drop within the block house. Two parallel disconnection switches, an eight-hundred-amp fused switch

---

1. The Cleveland Electric Illuminating Company was voluntarily dismissed without prejudice on February 28, 1994, prior to the trial court's granting of summary judgment and therefore is not a party to the present appeal.

and a one-hundred-amp fused switch, received power from the service drop. Another eight-hundred-amp disconnection switch in the block house received power from the on-site generator. The transfer of the two power sources had to be done manually. Absent from the system was a transfer switch between the CEI and the on-site generator power sources to ensure that there could not be a simultaneous connection of the two sources of power.

Appellant began operating appellee's power transfer system as a normal part of his duties during the summer of 1991. Appellant has a tenth-grade education and no previous electrical training, although he had worked around electrical lines in some of his previous work as a tree cutter. Appellant was instructed as to the procedure of properly operating the transfer system by Mr. Thompson and fellow worker Mr. Hanzel. Before the accident, appellant had operated the transfer system numerous times without any incident.

In the early morning hours of July 2, 1991, appellant went into the block house to execute the power transfer. Appellant threw the switch to turn off the generator from a "nine o'clock position to a six o'clock position." (This was the same procedure he had used to switch the power in the past.) After throwing this switch, appellant went over to the small CEI box and turned it on. At that moment, the transfer system exploded and the entire block house caught on fire. As a result of the explosion, appellant suffered burns to his right knee, face, arm and hand. Appellant also suffered serious injuries to his back as well as to his nervous system.

On March 18, 1992, appellants brought suit against CEI, alleging that CEI was negligent in the inspection, service and maintenance of the transfer system at Schloss Paving. On October 6, 1992, appellants filed an amended complaint, alleging an intentional tort against Schloss Paving.

On December 30, 1993, after all parties had extensively deposed numerous witnesses, appellee Schloss Paving filed its motion for summary judgment with the trial court. On February 24, 1994, appellants filed their motion in opposition to summary judgment alleging, *inter alia*, that appellee had full knowledge of the hazardous condition of the power transfer system yet intentionally required appellant to utilize the hazardous procedure.

On April 15, 1994, the trial court issued its ruling and opinion granting Schloss Paving summary judgment. The trial court opined that there was "no evidence that the apparent cause of malfunction—failure of the switch to move to the proper position when plaintiff moved it—had ever occurred before or that defendant had knowledge that such malfunction was likely." Therefore, the trial court held that the "plaintiff has not presented evidence that defendant had knowledge of a substantial certainty of injury to the employees."

From the trial court's adverse ruling, appellants brought the present appeal. Appellants' sole assignment of error provides:

"The trial court erred in granting Schloss Paving Co.'s motion for summary judgment because there were genuine issues of material fact with respect to plaintiff's claim of intentional tort."

A motion for summary judgment shall only be granted by a trial court when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Summary judgment shall not be granted unless it appears from the evidence that reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion is made. In reviewing a motion for summary judgment, the inferences to be drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267.

In a motion for summary judgment brought pursuant to Civ.R. 56, the burden of establishing that material facts are not in dispute and that no genuine issue of facts exists is on the party moving for summary judgment. *Harless v. Willis Day Warehousing* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. However, in that Civ.R. 56(E) requires that a party set forth specific facts showing that there is a genuine issue for trial, a party must so perform if he is to avoid summary judgment. Accordingly, in an action by an employee against the employer, the employee must set forth specific facts which show that there is a genuine issue of whether the employer had committed an intentional tort against the employee. *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 117, 522 N.E.2d 489, 504–505.

In the present case, the trial court held that appellants failed to meet the burden of Civ.R. 56(E) in attempting to prove the action required for a claim of intentional tort. Appellants seek this court's review of the trial court's decision. An appellate court's review of a finding of summary judgment is a *de novo* review. We will consider the facts and evidence properly presented by the parties to determine if there are genuine issues of material fact upon which reasonable minds could differ. *Stegawski v. Cleveland Anesthesia Group, Inc.* (1987), 37 Ohio App.3d 78, 523 N.E.2d 902. If this court determines that there exist genuine issues of material fact, then we will reverse the judgment of the trial court and remand the case for further proceedings.

The present case arose from an injury which occurred while the appellant was in the course and scope of his employment with appellee. However, this case does not fall within the "no fault" confines of the Ohio Workers' Compensation Act, R.C. 4123.01 *et seq.* Rather, this case represents a claim for an intentional

tort by an employer which removes the case from the protective confines of the Workers' Compensation Act. See *Blankenship v. Cincinnati Milacron Chem., Inc.* (1982), 69 Ohio St.2d 608, 23 O.O.3d 504, 433 N.E.2d 572.

The standard by which an employee must establish an intentional tort of an employer is set forth in *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108. Therein, the Ohio Supreme Court established a three-prong test as follows:

"Within the purview of Section 8(A) of the Restatement of the Law 2d, Torts, and Section 8 of Prosser & Keeton on Torts (5 Ed.1984), in order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. (*Van Fossen v. Babcock & Wilcox Co.* [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus, modified as set forth above and explained.)" *Fyffe, supra,* paragraph one of the syllabus.

Further, the court described the requisite intent of an employer in the following manner:

"To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk—something short of substantial certainty— is not intent. (*Van Fossen v. Babcock & Wilcox Co.* [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus, modified as set forth above and explained.)" *Fyffe, supra,* paragraph two of the syllabus.

Therefore, we must now determine whether the evidence submitted by the parties raises genuine issues of material fact upon which reasonable minds could come to different conclusions concerning whether appellee's conduct established an intentional tort under the three-prong test set forth in *Fyffe, supra.*

The initial inquiry must begin with the condition, design and sufficiency of the transfer system. Appellants claim that the transfer system, by its very nature, was a hazard for anyone who had to operate the system. In response to this contention, appellee argues that in its three years of operation, there were no prior accidents or problems with the transfer system and that no one had knowledge it represented a dangerous process or condition. Therefore, appellee argues, it was impossible for appellee to have intended any harm to appellant.

However, appellants claim that the entire transfer system was poorly designed and maintained. Appellants' complaint is based, in part, on the fact that the transfer system did not contain a transfer switch. A transfer switch would have ensured that the two sources of power would have never met, thus eliminating the possibility of an explosion as occurred in the present case.

The transfer system was designed and installed by the appellee's superintendent, Mr. Thompson. Appellants contend that Thompson had little or no electrical training and was highly unqualified to design an electrical transfer system. Further, appellants contend that the appellee knew that the transfer system, as it existed, was substantially certain to cause harm to an employee. In response to this substantial certainty of harm, the appellants contend, the appellee did nothing to correct the dangerous condition of the system.

The deposition testimony of Ralph Dolence, a licensed electrician and inspector for Aetna Insurance, indicated that the transfer system was not designed with a transfer switch. Dolence concluded that if there had been a transfer switch installed, the explosion and Cook's subsequent injuries would not have occurred. However, Dolence testified that a trained person who "understood how that [transfer] system worked and properly actuated the circuits in a sequence" would have no problem with the system. In addition, Dolence testified that the National Electrical Code did not require such a transfer switch to connect two or more sources of power. Specifically, Dolence testified in part as follows:

"A. I was explaining that for years and years this operation had worked because people had did it, were trained in doing it. It may or may not have been the best way or the proper way, but there was a procedure and if the procedure was followed, as it was for many years, there was no injuries, no damage, no equipment breakdown or failure would happen.

"What happened in my opinion was, as you read, the procedures that were laid out weren't followed. The gen set was not disconnected from the system, thus when CEI was put on line the resultant accident occurred.

"Q. Are you through?

"A. I'm through.

"Q. Now, let's see if you can answer my question.

"If there had been transfer equipment which was suitable for the intended use and so designed and installed to prevent the inadvertent interconnection of a normal and alternate source of supply would this injury have been prevented?

"A. No, there would not have been.

"Q. There would not have been an injury if that equipment had been installed?

"A. That's correct.

"Q. And that's the reason for this requirement, that is that there be equipment which would prevent this type of injury due to inadvertence, correct?

"A. That's the function of a transfer switch, yes.

"Q. And that's the reason for the code section?

"A. That's absolutely true."

In contradiction, attached to appellants' motion for summary judgment was the sworn affidavit of Dr. Theodore Bernstein. Bernstein is a consulting electrical engineer who examined the depositions, exhibits and photographs presented and gave his opinion as to the condition of the transfer system as well as the role of the parties in the particular accident. Bernstein opined that the transfer system as used by Schloss Paving violated at least five articles of the National Electrical Code. Also, in direct contradiction to the testimony of Dolence, Bernstein stated that the use of a transfer switch was a requirement and the lack of one within appellee's system was a violation of the National Electrical Code. Bernstein further opined that the transfer system, as installed, was a "known hazard such that serious injury was substantially certain to occur." In conclusion, Bernstein opined that the use of a transfer switch would have prevented the accident causing appellant's injuries. We find that the opinions expressed by these two witnesses create a genuine issue as to whether the first two prongs of the *Fyffe* test were established.

As to the first prong of the *Fyffe* test, evidence was clearly presented to show that the appellee had knowledge of the makeup of the transfer system; the appellee's own superintendent, Thomas Thompson, designed the system. Thompson, who was uncertified and unlicensed as an electrician, testified that he was the man who installed the transfer system in 1987 or 1988. Also, Robert Christopher Schloss, a vice-president of the appellee, testified that Thompson had supervisory responsibility over the day-to-day operations of the plant between 1987 and the date of the accident. In addition, Schloss testified that Thompson was in charge of repairing the plant, including the electrical aspects of the plant. Further, Schloss stated that he was unaware of Thompson's qualifications to do electrical work other than a belief that he had done electrical work in West

Virginia. Therefore, it is clear from this evidence that reasonable minds could conclude that the appellee had knowledge of the transfer system and its design.

As to the second prong of the *Fyffe* test, evidence was provided to show that the danger represented by the transfer system was substantially certain to cause harm. Dolence testified that the transfer system would cause an explosion if the procedure were not properly followed. The very design of the transfer system required that the manual procedure be properly followed in order to avoid an accident. The affidavit of Bernstein also bolstered this contention by stating that "a relatively small change in the procedure can cause a serious accident."

In addition, the deposition testimony of Thompson shows that he, as the superintendent of the plant, was acutely aware of the possibility of an explosion if the procedure were not followed. Specifically, Thompson testified as follows:

"Q: * * * And I take it when you were done wiring this section you recognized that it was possible, not preferable, not called for, but possible for both sources of power to supply power to the plant simultaneously, correct?

"A: Correct.

"Q: And you recognized and knew that there was no switch in the system that would prevent that interconnection, correct?

"A: Correct.

"Q: All right. I take it you were relying on the fuses to blow to prevent a catastrophe?

"A: Correct.

" * * *

"Q: All right. Nonetheless you recognized that it was wired in such a way so that both sources of power could be brought to bear on the plant simultaneously?

"A: Correct."

Therefore, from the evidence submitted, there has been presented a genuine issue as to whether the knowledge aspect of the second prong of the *Fyffe* test has been established.

Knowing that, the question becomes whether the appellee acted in a manner to require appellant to continue to perform the task. As evident from the testimony of Dolence, Thompson and Bernstein, it was necessary for a very specific procedure to be performed in order to avoid an accident. If this procedure were performed properly, Dolence testified, "there was no problem that could occur."

However, appellants allege that the switch to execute the system was worn and "loose." This allegation is supported by the testimony of Hanzel, *infra*. Testimony was also presented to show that the latch covering the electrical box was

broken, thereby causing the cover of the box to protrude and make it difficult to properly throw the switch, thereby disconnecting the power. In essence, evidence was presented to show that the metal box housing one of the transfer switches was in a dilapidated condition, such that its proper function was greatly diminished.

Appellant argues that when he pulled this switch, he thought he heard the system turn off. Specifically, Ed Cook testified as follows:

"Q. So that we're clear on things here, the night of the accident, and on previous occasions when you did the procedure, the first switch that you would activate or deactivate was on the box that we've marked with the letter G in Exhibit B.

"A. Yes.

"Q. And on the night of the accident, that's where you first went to, that's the box you first went to?

"A. Yes.

"Q. Okay. And you told me what you did with the switch that night.

"A. I threw it from a nine o'clock position to a six o'clock position.

"Q. Did it get all the way down into the six o'clock position?

"A. As far as I recollect, yes, it did. When it hit, you could—it can only go so far, and it stops.

"\* \* \*

"Q. All right. And then, again, that night, after you hit the switch that we've been talking about, what is the next thing you did?

"A. I walked over and hit the other box, the small one, kicked it on.

"\* \* \*

"Q. And tell me what happened.

"A. It exploded."

It appears from Dolence's testimony and that of Cook that the cause of the accident was Cook's failure to completely turn the first switch, thereby failing to disconnect the power coming into the system from the on-site generator. When he subsequently turned on the switch to allow CEI power to come into the system, the two power sources arced and the system exploded.

Edward Hanzel, a truck driver and "yardman" at Schloss from 1980 to 1992, testified about the condition of the transfer system and the presence of the loose handle on the system. Hanzel testified that in early 1989, he began to operate the transfer system. Specifically, he testified in part as follows:

"Q. How did it happen that you did it for the first time?

"A. I watched Bill Moskin do it.

" * * *

"Q. What was Bill's job?

"A. At that time he was plant superintendent.

"Q. That is before Thompson?

"A. Yes.

" * * *

"Q. How many times do you think you did the switching procedure before the equipment was changed in the blockhouse?

"A. Probably about five times.

"Q. Did you have any problems on any of those occasions doing the procedure?

"A. Only one time the switch I thought was out. When I went to shut down the power I flipped the switch, then I walked over to kill the motor and he come running out, asked me what I did because the lights was fading. It was still engaged when I was killing the motor. The more the motor slowed down, the dimmer the lights got. He said what he had to do was flick the handle, knock it down to make sure it disengaged.

"Q. This is a handle on what?

"A. On the Gen Set [on-site generator].

" * * *

"A. I thought it was disengaged, it wasn't. It sounded like it broke circuit but it didn't.

"Q. You had not yet turned off the engine to the Gen Set?

"A. I was turning the engine off when he came out, asked me what I did. He said you have to flip the switch first. I told him I did. It wasn't all the way down.

"Q. Did he tell you that a problem—could have caused a problem or gone into any detail?

"A. He told me to make sure when you do that, make sure that is all the way down."

Hanzel further testified that the handle had always been loose and that he had informed the plant superintendent, Tom Thompson, about the condition. Specifically, he testified in part as follows:

"Q. * * * I was going to talk to you about the handle on the generator disconnection box. Is that the one you are referring to as being loose?

"A. Yes.

"Q. When did you first notice that?

"A. From the time it was installed.

"Q. Was it always loose?

"A. Yes. This time it seemed more than normal.

"Q. Was that the first time you noticed it was looser than it was normally loose?

"A. Yes.

"Q. That again was in June of '91. Did you inspect it at all to try to determine why it was looser?

"A. No. I'm not an electrician * * *.

"Q. Did you bring it to anyone's attention?

"A. Yes, I spoke with Thompson about it. He just said that he was going to look at it.

"Q. Do you know if he did?

"A. No, sir.

" * * *

"Q. Did it continue to get looser?

"A. No, I would say it probably had an inch or so play in it.

"Q. When you say an inch of play, how would that change the way it worked?

"A. Well, it would go from six o'clock, 6:30 it would be off, nine o'clock it would be on. If you took it from 6:30 to nine o'clock, let it go, it stays on. It would be down from on back toward 6:30 I would say an inch, inch and a half."

Appellee argues that Hanzel's testimony, even if construed most strongly in favor of appellants, is not sufficient to establish the requisite element of knowledge on the part of appellee. Considering Hanzel's testimony with all the other evidence presented, we do not agree.

The focus of an intentional tort under the standard set forth in *Fyffe* and *Van Fossen* rests on the knowledge of the employer regarding a substantial certainty of injury. *Sanek v. Duracote Corp.* (1989), 43 Ohio St.3d 169, 170, 539 N.E.2d 1114, 1115. The employee has the burden of proving that the employer had the actual knowledge of the exact dangers which ultimately caused the

injury. *Van Fossen, supra,* 36 Ohio St.3d at 112, 522 N.E.2d at 500–501; *Youssef v. Parr, Inc.* (1990), 69 Ohio App.3d 679, 591 N.E.2d 762.

Appellee contends that there is no proof that it had knowledge that the transfer system was substantially certain to cause injury or harm. It is appellee's contention that the lack of any previous accidents is evidence that it could not have known that the transfer system was substantially certain to cause harm. In support of its motion for summary judgment, appellee cites this court's ruling in *Felden v. Ashland Chem. Co.* (Oct. 21, 1993), Cuyahoga App. Nos. 64313 and 64346, unreported. In *Felden,* this court found an intentional tort cause of action was present based on the following facts: The plaintiff was transporting drums of formic acid on a forklift when he struck a steel post located in the middle of the plant driveway. The drums burst open, and the plaintiff suffered severe chemical burns to a great deal of his body. At issue was the knowledge that the defendant/employer had of the danger posed by the steel post. Evidence was adduced that showed that there were as many as seven or eight previous collisions with the steel post. In addition, evidence showed that there were numerous safety meetings with plant managers discussing the steel post. This court held that the defendant maintained the necessary intent to injure the plaintiff by failing to remove the steel post despite the known threat and substantial certainty of harm the post posed to defendant's employees.

Appellee cites *Felden,* stating that "this is the type of notice which reviewing courts have deemed necessary to establish the knowledge requirement of the substantial certainty test." Appellee's reliance on *Felden* is misplaced. While the occurrence and proof of previous accidents certainly assists in showing knowledge of a substantial certainty of harm on the part of the employer, it is not the sole determinative factor.

Rather, the focus of the substantial certainty test set forth in *Fyffe* is not only how often the accident will occur but also the employer's knowledge of the certainty of death or injury to an employee when an accident does occur. See *Kreais v. Chemi–Trol Chem. Co.* (1989), 52 Ohio App.3d 74, 76, 557 N.E.2d 155, 157. There is no dispute that there were no previous accidents relating to the power transfer system; nonetheless, we are not convinced that the lack of previous accidents is enough to prove that appellee did not have knowledge of the dangerous nature of the transfer system.

The appreciation of danger can be obtained in a myriad of ways other than personal knowledge or previous injuries. Simply because people are not injured, maimed or killed every time they encounter a device or procedure is not solely determinative of the question of whether that procedure or device is dangerous and unsafe. If we were to accept the appellee's reasoning, it would be tantamount to giving every employer one free injury for every decision, procedure or

device it decided to use, regardless of the knowledge or substantial certainty of the danger that the employer's decision entailed. This is not the purpose of *Fyffe*. It is not incumbent that a person be burned before one knows not to play with fire.

In the present case, there is ample evidence of the appellee's knowledge of the inherent danger and substantial certainty of injury presented by the system. The testimony of appellee's supervisor, Tom Thompson, is of particular importance to this issue. He testified as follows:

"Q. And you recognized that there was no switch in the system that would prevent that interconnection, correct?

"A. Correct.

" * * *

"Q. All right. Nonetheless you recognized that it was wired in such a way so that both sources of power could be brought to bear on the plant simultaneously?

"A. Correct."

In addition, the report attached to the affidavit of Bernstein stated that the interrupting ratings for the sixty- or one-hundred-amp fuses were too low for the available fault current of the system. This meant that they were far too low to rely upon to stop a surge from the connecting of the two power sources. (In reality, this was proven when the fuses exploded when the generator power and the CEI supply were paralleled.) However, Thompson relied on his belief that these fuses would prevent such a catastrophe.

Many circumstances in this case could allow reasonable minds to conclude that the employer had a substantial certainty that the transfer system would result in harm to its employees. As previously noted, there is evidence which plainly shows that if the "procedure" were not properly followed, then the accident was almost certain to occur. Also, there is evidence to show that the appellee blindly relied upon the "knowledge" and "expertise" of an unqualified and uncertified supervisor in designing an electrical system on its premises—a system that, by its very nature, was inherently dangerous.

In addition, there is evidence to show that the employer had knowledge of a faulty and loose handle which was required to completely disconnect the power source from the system. Reasonable minds could conclude that this condition, when coupled with the design of the transfer system, shows that the appellee was substantially certain that harm would occur.

Reasonable minds could also conclude that the mere presence of such a dangerous electrical system, designed by a person with little or no electrical knowledge, could constitute the necessary notice and intent upon the employer to fulfill the requirements of the *Fyffe* test. In addition, reasonable minds could

conclude that requiring an employee to execute a procedure that, if executed slightly wrong, could cause grave danger to an employee is sufficient to fulfill the knowledge requirements of *Fyffe*.

However, we are not the finders of fact. These issues are to be properly left for the final determination of the trier of fact.

Therefore, the present question before us becomes: Weighing the evidence and inferences found in the record in a manner favorable to appellants, was there reliable, probative evidence to show that Schloss Paving intentionally proceeded with the use of the transfer system despite a threat of harm to others which was substantially certain to occur?

We find that the evidence presented by the appellants was sufficient to satisfy the three-prong test of *Fyffe* for the purpose of opposing appellee's motion for summary judgment. The evidence submitted by the parties is contradictory in many material aspects; however, construing the evidence presented in a light most favorable to the appellants, we find that reasonable minds could conclude that appellee knew that the use of its transfer system was substantially certain to cause harm to others and thus constituted an intentional tort as defined in *Fyffe*.

Accordingly, we reverse the judgment of the trial court granting summary judgment in favor of appellee Schloss Paving and remand the cause for further proceedings.

*Judgment reversed*
*and cause remanded.*

HARPER, P.J., and O'DONNELL, JJ., concur.