OPINION
This appeal is taken by Plaintiff Appellant Pamela Long from the judgment of the Court of Common Pleas of Crawford County granting summary judgment to Defendant Appellees International Wire Group, Inc., et al.
On July 12, 1997, Pamela Long was injured while she was operating a machine known as the midline cutter at Burcliff Industries Inc. in Bucyrus, Ohio. Burcliff Industries is a division of International Wire Inc. (hereinafter collectively known as "Burcliff"), which is based in South Bend, Indiana. Long was employed at Burcliff as a multi-tasked factory worker for fourteen (14) years.
Burcliff manufactures wire harnesses, which are sold for various applications, such as for use in the automotive manufacturing industry, the heavy farm implement manufacturing industry, and the heavy appliance manufacturing industry. Using various tools and machines located within the factory, Burcliff employees manipulate cables of various sizes to the specifications of the manufacturer. Employees at Burcliff perform several tasks. One such task requires the employees to splice the wires within the cables, cut the cables to specific lengths and install electronic terminals on the wires.
There are several production lines and several departments within the Burcliff factory. The production line associated with splicing wires and connecting terminals to the wires is called the "midline". There are three separate machines located at the "midline" that are necessary for stripping the wires and attaching the terminals. There are two terminating machines that are used to install terminals on the ends of the wires and there is a "midline cutter", a machine used to "crimp" the cable housing the wires.
When the wire packages ("cables") arrive at the "midline" they are housed in black cable. Each wire in the black cable housing is fully insulated. The "cables" arrive wound like a hose hanging on a rack. The ends of the "cables" have been "stripped". In other words, the black cable housing the wires has been removed from the ends of the cable and the insulation covering the copper wires has been stripped at the ends revealing several bare copper wires. The cables are removed from the racks and are first taken to the terminating machine where terminals are installed on the ends of the bare copper wires.
After the terminals are installed the cables are then taken to the "midline cutter". The "midline cutter" is a press containing two blades. The blades are housed between three concrete slabs. The base of the machine upon which the cables are placed is also a concrete slab. When the foot pedal is activated the press is triggered and the concrete slabs depress onto the cable and concrete base and the blades are released. After the blades are released and the cable is cut the blades automatically recoil back into the concrete slabs and the press is released.
A protective guard, made of plexi-glass, surrounds the base of the midline cutter. There are two indentations on both sides of the guard allowing the cables to run through the base. The guard prevents an employee's hand from being caught in the "midline cutter".
At the "midline cutter" each cable is marked in the center by a colored band to indicate where the cable is to be "crimped" or cut. The employee must grab the cable firmly on either side so that the colored band is in the center of their hands. Then the cable is slid into the "midline cutter". The employee centers the colored band between the two blades in the "midline cutter". While firmly grasping both ends of the cable the employee must depress a foot pedal that releases the "midline cutter" and cuts the cable.
After the cables are crimped, an employee must use a utility knife to cut a straight line between the two cuts in the cable and strip the small section of black cable off leaving a section of insulated wires showing. Once they have finished stripping the midsection of the cable, the employee may begin the entire process again by retrieving another cable from the rack.
On Saturday July 12, 1997, while using the "midline cutter" Long was injured. According to Long after she had inserted the cable in the machine and depressed the pedal to activate the machine the cable "twisted and turned" pulling her left hand inside the press as it was activated and the blades were released. Her hand was crushed. No one witnessed the accident. However, several other employees heard Long scream as her left hand got caught in the press and ran to her aid. After several minutes Long's left hand was removed from the press and she was taken to the hospital.
After the accident, Mark Snow, Burcliff's plant manager, inspected the machine. He noticed that a portion of the left side guard was missing. He asked Arnie Auck, a maintenance man, to fix the guard immediately and ordered that the machine was not to be used "until it was repaired." Snow claimed that none of his employees had informed him that the guard on the machine was broken prior to Long's injury.
Several other employees who also worked on the "midline" or repaired the "midline cutter" claimed that the left side of the guard on the "midline cutter" had been broken for quite some time and that even after they had informed their supervisor, Rosemary Jolley, it remained unrepaired. Long maintained that there was never a guard on the machine during the three-week period she operated it before her injury.
On July 10, 1998, Long filed a complaint against Burcliff alleging that Burcliff had "intentionally disabled or removed" the safety devices or guarding mechanisms attached to the press and thus acted "with conscious disregard and with knowledge that an injury was substantially certain to occur." Further she alleged that Burcliff had "deliberately and intentionally injured" her. After several months of discovery Burcliff filed a motion for summary judgment. Long responded accordingly.
On March 10, 2000, the trial court granted Burcliff's motion for summary judgment holding that Long had failed to show the existence of a genuine issue of material fact with respect to all of the elements of an employer intentional tort. Specifically the judgment entry stated in part:
 The Court finds that the fact that no employee has ever been hurt on this press is material and adds to the fact that the employer did not have the requisite knowledge of a dangerous condition. Plaintiff has failed to present any evidence of any incidents tending to show that the press in question on which the Plaintiff was injured was known to the employer to be dangerous even if the guard was broken, so no genuine issues of material fact were created. The Plaintiff fails to present any evidence that the employer had knowledge that the guard was broken. Further, the Plaintiff has failed to present any evidence that the employer knew or believed that through the use of the press, with or without the guard, harm was substantially certain to an employee, so no genuine issues of material fact were created. The employer had not been cited by OSHA for a known danger because the guard on that press was broken, and the violation of an OSHA regulation, even if the employer had been cited, is not in and or (sic) itself evidence of intent by the employer to maintain a dangerous condition.
On appeal from that judgment Long makes the following two assignments of error:
 The Trial Court erred in holding that Plaintiff failed to present evidence tending to show that defendant had knowledge of a dangerous condition within it business as required by the first prong of the tripartite analysis of Fyffe.
 The Trial Court erred in holding that Plaintiff had failed to present evidence tending to show that injury to an employee, if exposed to the unguarded pinch point, was substantially certain to result as required by the second prong of the tripartite analysis of Fyffe.
Long's two assignments of error both claim that the trial court erred in granting summary judgment when issues of material fact exist. Specifically, Long claims that the trial judge erred when he stated that Long had failed to present the evidence necessary for proof of an employer intentional tort. Because the assignments of error are interrelated they will be discussed together.
When reviewing summary judgment, we review the judgment independently without any deference to the previous determination made by the trial court. Conley-Slowinski v. Superior Spinning Stamping Co. (1988), 128 Ohio App.3d 360. The standard of review in this court is de novo. AAAA Enterprises, Inc. v. River PlaceCommunity Urban Redevelopment Corp. (1990), 50 Ohio St.3d 157,553 N.E.2d 597.
Civil Rule 56 requires the court to determine from thematerials properly to be considered and timely filed in theaction, resolving all doubts against the movant, that no genuineissue exists as to any material fact, that reasonable minds couldreach no other conclusion and that the moving party is entitled tojudgment as a matter of law. Therefore summary judgment isappropriate only when the following have been established: (1)that there is no genuine issue as to any material fact; (2) themoving party is entitled to judgment as a matter of law; and (3)construing the evidence most favorable in the light of thenon-moving party, reasonable minds can come to but one conclusionand that conclusion is adverse to the non-moving party.Civ.R.56(C); Bostic v. Connor (1988), 37 Ohio St.3d 144,524 N.E.2d 881.
The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett (1986),477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265.
Once the moving party meets its burden, the non-moving party then has a reciprocal burden to set forth specific facts showing that there is a genuine issue of material fact for trial. A. Doev. First Presbyterian Church (USA) (1998), 126 Ohio App.3d 358,364; Civ.R. 56(E). The non moving party may not rest on the mere allegations of her pleading. State ex rel. Burns v. Athens Cty.Clerk of Courts(1998) 83 Ohio St.3d 523, 524 citing Mootispaw v.Eckstein(1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197, 1199; Civ.R. 56(E). Most importantly, the non-movant's failure of proof on an essential element of the case necessarily renders all other facts immaterial. Celotex Corp. v. Catrett (1986), 477 U.S. 317,323, 106 S.Ct. 2548, 91 L.Ed.2d 265.
Generally, an employee's only recourse for compensation due toinjury sustained in the course of employment in Ohio is theWorker's Compensation system. However, under the common law, aninjured employee may seek compensation directly from the employerif the injury was the result of an intentional tort by theemployer. Blankenship v. Cincinnati Milacron Chemicals, Inc.
(1982), 69 Ohio St.2d 608.
In order to determine whether an employer has indeed committed an intentional tort resulting in injury to the employee, the trier of fact must apply the following tripartite analysis set forth by the Ohio Supreme Court in Fyffe v. Jeno's, Inc. (1991),59 Ohio St.3d 115:
* * *
 (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.
Id. at paragraph one of the syllabus.
 A. Dangerous Condition
The first element necessary for proof that Burcliff committed an intentional tort is that the employer, Burcliff, must have had knowledge "of the existence of a dangerous process, procedure, instrumentality or condition within its business operation". In order to satisfy the first prong then Long must show: 1) there was a dangerous condition and 2) Burcliff had knowledge that that dangerous condition existed.
In determining whether the condition or procedure was indeed dangerous this court cautioned:
 "[D]angerous work must be distinguished from an otherwise dangerous condition within that work. It is the latter of which that must be within the knowledge of the employer before liability could attach."
Naragon v. Dayton Power Light Co. (March 30, 1998), ShelbyApp. No. 17-97-21, unreported, citing Brady v. Safety-Kleen (1991),61 Ohio St.3d 624, 576 N.E.2d 722. It must be remembered that those injuries that occur in the scope of employment by definition are not intentional torts. "A workplace intentional tort is one suffered outside the scope of employment, beyond the `natural hazard[s]' of one's employment. Were it otherwise, any injury associated with inherently dangerous work" like stripping electrical wire in high power presses, "could subject an employer to intentional tort liability, whatever the cause." Naragon at 7.
In order to determine whether the employer had knowledge that such condition or procedure was dangerous this court must determine the employer's actual knowledge of the dangerous condition. Fultz v. Baja Boats, Inc. (Feb. 18, 1994), Crawford App. No. 3-93-10, unreported. This court has cautioned:
 "that this is not the `reasonable person' standard for determining negligence or recklessness; that is, the fact that the employer should have known it was requiring the employee to work under such dangerous conditions that he would certainly be injured is not enough to establish a case in intentional tort. Rather the determination rests upon a claimant's alleging facts which show the employer's actual knowledge of the situation."
Therefore the scope of our inquiry must focus on whether this was an injury associated with "inherently dangerous" work and thus outside the scope of Long's employment and Burcliff had knowledge that the work was dangerous.
Long alleged that the dangerous condition to which she was exposed and Burcliff had knowledge was the lack of an effective safety device, the complete plexi-glass guard, on the "midline cutter". However, Burcliff claims that none of the supervisors were aware of the missing or debilitated guard.
Long presented evidence at summary judgment that other employees noticed that there was something wrong with the guard and reported it to their supervisor. Specifically, two Burcliff employees, Floyd T. Higgins and Virginia Zeigler, who also worked on the "midline cutter", testified that they reported the broken guard to their supervisor, Rosemary Jolley.
Long presented evidence from an expert, Gerald Rennell. He testified to how dangerous the machine was without the guard. In support of her argument that the absence of the guard was dangerous Long relies on the statements made by Mark Snow, Burcliff's plant manager, when he ordered that the machine be fixed immediately because it was an obvious danger. In his deposition, Snow testified as follows concerning the "midline cutter":
Q: Okay. Well, did you go in any particular order?
 A: Arnie was the closest. I talked to him first, and our discussion was very brief.
 Q: What was, as best you can remember, the specifics of that conversation?
 A: It was mainly focused on the guard and the fact that the guard did have a piece missing and he was to immediately fix that guard and we were not going to run it until it was until it was repaired.
* * *
 Q: Well, let me ask you a separate question, I guess. As I understand it, when you arrived on the scene, within a matter of seconds you advised Mr. Auck to take the guard and fix it; is that correct?
 A: That issue didn't need discussion. It was apparent at that moment that it needed that it needed repair.
 Q: So it would this was an obvious condition that needed repair and presented a danger to an employee operating a machine, correct?
A: Yes.
The foregoing statements elicited from Mark Snow at the deposition do indeed reveal that as Burcliff's plant manager he was aware that a missing guard on the "midline cutter" may indeed be dangerous. Moreover, Long presented testimony that two other employees had informed their supervisor of problems with the guard on the "midline cutter". Thus, the record construed in the light most favorable to Long supports the assertion that working on the "midline cutter" in the absence of a guard was dangerous work outside the scope of Long's employment and Burcliff knew the work was dangerous. Therefore, Long has presented a genuine issue of fact as to whether or not the "midline cutter" was missing a guard and Burcliff, in fact, knew it was missing a guard.
 B. Injury is Substantially Certain
The second element necessary for proof that an employer committed an intentional tort is whether the employer knew that if the employee was subject to the dangerous condition "then harm to the employee will be a substantial certainty." Fyffe at paragraph one of the syllabus. In applying the second prong of the Fyffe
test, we have previously held that substantial certainty is "greater than an employer's knowledge of a high risk of harm or danger". Cathey v. Cassens Transport Co. (Feb. 4, 2000), Union App. No. 14-99-35, unreported. See also Jenkins v. Quincy FoundryDivision of Warrant Tool Company (Feb. 23, 1990), Logan App. No. 8-88-26, unreported. Myers v. Oberlin Processing, Inc. (Sept. 27, 1996), Seneca App. No. 13-96-20, unreported.
Long argues that "the presence of the danger presented by the unguarded machine for months and the repeated exposure of [Long] to such danger, day after day, together with the close proximity of the operators hands to the point of operation are the precise combination of circumstances" that make the injury to Long one that is "substantially certain to occur." In addition, Long presented evidence from expert witness, Gerald Rennell, that continued use of the "midline cutter" in the absence of a guard caused a condition in which an injury was substantially certain to occur. In opposition, Burcliff argues that Long's claim must fail because no employees ever complained about the machine or its alleged dangers and no injuries occurred before Long's. Moreover, Burcliff maintains that Rennell's testimony is inadmissible.
Burcliff's initial contention that no other employees complained about the machine is inaccurate considering the record before this court and is thus without merit. Second, Burcliff may not now assert a claim that Rennell's testimony is in admissible because it failed to object to its admission within the time allotted by the trial court. Finally, simply because an injury has never occurred on the "midline cutter" before does not mean that an injury is not substantially certain to occur given the right set of circumstances. Lack of a prior injury cannot bar recovery completely but it may be considered in determining whether or not an injury was substantially certain to occur. "It is not incumbent that a person be burned before one knows not to play with fire." Cook v. Cleveland Elec. Illum. Co. (1995),102 Ohio App.3d 417, 430.
Thus the record construed in the light most favorable to Long supports the assertion Burcliff knew that if Long was required to work on the "midline cutter" in the continued absence of the guard then harm to Long may be a substantial certainty. As a result, this court finds that there is a genuine issue of material fact as to whether or not Burcliff knew that harm to Long was indeed a "substantial certainty" if she continued to work on the "midline cutter" in the absence of a guard.
 C. Requirement that the Employee perform the Dangerous Work
The third and final element essential for proof of an employer intentional tort requires the employee to show that he was required to perform the dangerous task. The record reveals that neither Long nor Burcliff dispute that Long was required to run the machine that morning. Once again, construing the evidence in the light most favorable to Long, this court finds that there is a genuine issue of material fact as to whether or not Long was required to perform the dangerous task.
Having found error prejudicial to Appellant, Pamela Long, her sole assignment of error is sustained and the judgment of the Court of Common Pleas of Crawford County is reversed and remanded for further proceedings in accordance with this opinion.
Judgment reversed and cause remanded.
SHAW and WALTERS, JJ., concur.