OPINION
Holly Martin Moebius is appealing the decision of the Montgomery County Court of Common Pleas granting General Motors' ("GM") motion for summary judgment.
Moebius was injured while working at GM on September 7, 1997, when she attempted to purge a spray gun attached to Chain-on-Edge Machine #2 ("COE Machine"). The COE Machine consists of a series of spindles mounted on a chain set on its edge which transports various production parts through two spray booths so that the parts could be sprayed with a primer or adhesive coating. While in the spray booth, the spindles rotate the parts in front of the spray guns, which are set into pillars in the center of each booth, in order to apply an even coating to the part.
The spray guns are cleaned or "purged" with a solvent on a routine basis and whenever an operator determines that the spray gun is clogged and is not providing a sufficient coating to the parts. To protect the parts and the spindles from being accidentally sprayed with solvent during the purging process, the operator must remove the parts and the spindles before purging the spray gun. To remove the spindles and the parts from the conveyor chain, the operator must first stop the lateral movement of the chain, then pull an E-stop safety cord, which is set parallel and less than one foot from the conveyor chain. Pulling the cord stops the rotation of the spindles and their respective parts almost immediately[1]
so that the operator can safely remove the parts and spindles. Once the parts and the spindles are removed, the operator can run solvent through the spray gun.
In order to purge the spray guns, Moebius entered the booth, stopping the lateral movement of the conveyor chain. She turned, selected the appropriate nozzle with which she would purge the spray gun with her left hand, and then turned back to face the chain, squatting to observe the gun at eye level. Moebius then reached out with both hands to pull the safety cord running horizontally in front of her in order to stop the spindles. Instead of the spindles stopping instantaneously, as they had done in the past, the spindles continued to rotate.
Moebius reached out to grab the part, as she had done many times in the past, when she realized that the spindles were still turning. She tried to remove her hand, but the spindles rotated her glove and pulled in her arm, rotating her shoulder. When the spindles finally stopped, she was left in a kneeling position. Moebius claims that she remained in a kneeling position for approximately thirty minutes, periodically losing consciousness, until she was able to remove her hand from the machine. Soon thereafter, she was transported to the emergency room.
In her deposition, Moebius contended that in her experience working with the COE Machine, that was the first time that the safety guard had failed to immediately stop the spindles from rotating. She stated that it had not been her primary job to operate the COE Machine, and that she had been trained to run it in order to "fill in" if a regular operator was sick or absent. Her training consisted of watching her supervisors, Dion Lane, Garvin Glass, and Rickie Spears, operate the machine. No written instructions were provided to her. At no point in her training did anyone educate her not to touch the spindles when they were rotating. However, Moebius mentioned that during the training session and times thereafter when she had operated the COE Machine, the spindles had almost immediately stopped rotating when the safety cord had been pulled, and thus she had not seen anyone touch the rotating spindles when she had been trained.
After the accident, Moebius spoke with Glass, who informed her that just prior to her accident, the safety guard had been removed from the machine and a five-second delay had been added between the pulling of the safety cord and the time in which it took the spindles to stop rotating. Glass informed Moebius that the stop cord had been altered to increase production, but that he would deny having told Moebius this information. Additionally, GM Manufacturing Engineer Mark Gudorf informed Moebius that he was aware of the five-second delay and that he had ordered such for production purposes.
Moebius sustained injuries resulting from the accident. She filed a complaint against GM for negligence and an intentional tort in the Court of Common Pleas of Montgomery County, Ohio on September 7, 1999. GM filed a motion for summary judgment on June 29, 2001, asserting that GM had never required Moebius to remove a part from the COE Machine while the spindles were still rotating and that GM did not know that injury to Moebius was substantially certain to occur. In her reply, Moebius asserted that GM had created a five-second delay from the time the stop cord was pulled to the time the spindles stopped rotating, creating a dangerous condition that GM was substantially certain would cause injury to Moebius. To support this allegation, Moebius relied heavily upon the conversation she had with Glass regarding the changes made to the system.
In its November 14, 2001 decision, the trial court found that the conversation Moebius had had with Glass constituted hearsay, and without that statement, Moebius had failed to present evidence supporting the allegation that a five-second delay was placed on the COE Machine by GM. Accordingly, the trial court found that Moebius failed to prove that GM had knowledge of a dangerous condition in this instance. Additionally, the trial court found that the evidence in this case did not support Moebius' claims that GM knew that injury was substantially certain to occur under these circumstances. Finally, the trial court found that Moebius had failed to present an issue of fact that GM had required her to perform a dangerous task, to wit: purging the spray gun in a manner that led to her injury, as Moebius had not presented evidence that GM had required Moebius to grasp the spindle while it was still rotating, or that GM had altered or disabled the safety device on the COE Machine which would have stopped the rotation of the spindles.
Moebius now appeals the trial court's decision, asserting two assignments of error.
Moebius' first assignment of error states:
 "The trial court erred to the prejudice of the Plaintiff-Appellant when it incorrectly excluded as hearsay admissions of fault by Defendant-Appellee contrary to Evid.R. 801(D)(2)(d) and by failing to construe the evidence in favor of the Plaintiff-Appellant as required by Civ.R. 56."
Moebius asserts error in the trial court's exclusion of several statements made by GM employees that should have been admitted as admissions by a party-opponent, an exception to hearsay. The conversations at issue occurred after Moebius' accident, in which Glass admitted to Moebius that he had known that the safety guards had been removed from the COE Machine, and that Gudorf, Lane and Spears had all been aware of the newly-instituted five-second delay. Glass allegedly informed Moebius that the delay had been put in place to keep production up and that the injury could have been prevented with proper training. Additionally, the trial court excluded a statement made by Gudorf, whereby Gudorf admitted to Moebius in the presence of a third party that he had ordered the belt drive delay on the COE Machine for "production purposes."
GM argues that Glass' and Gudorf's statements were not made within the scope of their employment, and that they do not address whether GM had been aware of the situation before the accident occurred or whether GM had known that injury had been substantially certain to occur.
The trial court has broad discretion in determining the admissibility of evidence at trial. Absent a demonstration of an abuse of discretion, a trial court's determination that evidence will be admitted or excluded will not be reversed on appeal. O'Brien v. Angley (1980),63 Ohio St.2d 159, 163, 17 O.O.3d 98. Abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
Moebius argues that her conversations with Glass and Gudorf are not hearsay and are admissible because they are admissions by party-opponents. Evid.R. 801(D)(2) states "(D) * * * A statement is not hearsay if: * * * (2) Admission by party-opponent. The statement is offered against a party and is (a) his own statement, in either his individual or a representative capacity[.]"
General principles of agency law allow for the admissibility of statements of an agent against the principal when the statements are made within the scope of the agent's authority with regard to the subject of the transaction. See Kimbark v. Timken Roller Bearing Co. (1926),115 Ohio St. 161; Goz v. Tenney (1922), 104 Ohio St. 500; Szymczak v.Midwest Premium Finance Co. (1984), 19 Ohio App.3d 173. Furthermore, Ohio law has consistently held that a statement by an agent of a corporate party conceding that a condition should not have existed is not hearsay under the Rules of Evidence. Crane v. Lakewood Hosp. (1995),103 Ohio App.3d 129, 134; Szymczak, supra; Le-Gals, Inc. v. D-K Assoc.Inc. (June 15, 1989), Cuyahoga App. No. 55381; Sobony v. Osobo Games Toys, Inc. (Apr. 16, 1987), Cuyahoga App. No. 51720; Parker v. BaldwinManor Nursing Home (June 21, 1984), Cuyahoga App. No. 47714.
Glass, Moebius' supervisor, and Gudorf, Moebius' foreman, were clearly agents of GM. The statements they made to Moebius concerned matters within the scope of their agency relationship to GM in the capacity of Moebius' supervisor and foreman, as they dealt with the operations, alteration, and consequences of the COE Machine. Furthermore, the statements were made to Moebius during the existence of their relationship with GM. Therefore, such admissions should have been permitted to stand as some probative evidence that GM did commit an intentional tort against Moebius.
Moebius' first assignment of error is sustained.
Moebius' second assignment of error states:
 "The trial court erred to the prejudice of the Plaintiff-Appellant when the trial court granted the Defendant-Appellee's motion for summary judgment after the Plaintiff-Appellant had presented substantial evidence presenting a genuine issue of material fact as to each and every element of Plaintiff-Appellant's intentional tort claim and by not construing the evidence in favor of the Plaintiff-Appellant."
Moebius claims that summary judgment was inappropriate because reasonable minds could differ as to whether she had established the elements of an intentional tort.
When reviewing a trial court's grant of summary judgment, an appellate court conducts a de novo review. Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102, 105, 1996-Ohio-336. "De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial." Brewer v. Cleveland City Schools Bd. ofEdn. (1997), 122 Ohio App.3d 378, 383, citing Dupler v. Mansfield JournalCo. (1980), 64 Ohio St.2d 116, 119-120, 18 O.O.3d 354. Thus, the trial court's decision is not granted any deference by the reviewing appellate court. Brown v. Scioto Cty. Bd. of Commrs. (1993), 87 Ohio App.3d 704,711.
Summary judgment can be appropriately granted where (1) "there is no genuine issue as to any material fact; (2) * * * the moving party is entitled to judgment as a matter of law; and (3) * * * reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor."Harless v. Willis Day Warehousing Co., Inc. (1978), 54 Ohio St.2d 64,66, 8 O.O.3d 73; see, also, Civ.R. 56(C). The movant has the burden to prove that no genuine issues of material fact exist by specifically pointing to evidence in the pleadings, depositions, answers to interrogatories, written admissions, and affidavits, which show that the non-movant has no evidence to support its claims. Harless, supra; Dresherv. Burt (1996), 75 Ohio St.3d 280, 293, 1996-Ohio-107; Civ.R. 56(C).
To establish "intent" for the purpose of proving that an employer committed an intentional tort against its employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, or condition within its business operation; (2) knowledge by the employer that, if the employee is subjected by his employment to the dangerous process, procedure, or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances and with such knowledge, required the employee to continue to perform the dangerous task. Fyffev. Jeno's, Inc. (1991), 59 Ohio St.3d 115, paragraph one of the syllabus, modifying Van Fossen v. Babcock Wilcox Co. (1988),36 Ohio St.3d 100, paragraph five of the syllabus. A plaintiff must satisfy all three prongs, therefore a failure of proof with respect to any one prong renders immaterial any disputes of fact with respect to the other prongs. Timmons v. Marketing Services by Vectra, Inc. (Nov. 18, 1999), Franklin App. No. 99AP-272.
 Dangerous Condition
Concerning the first prong of the Fyffe test, Moebius asserts that there is ample evidence in the record to find a genuine issue of material fact as to whether GM had knowledge of a dangerous condition or procedure.
To satisfy this first prong, Moebius has to demonstrate that (1) there was a dangerous condition, and (2) GM had knowledge that the dangerous condition existed. In determining whether a dangerous condition existed, "a workplace intentional tort injury is one suffered outside the scope of employment, beyond the `natural hazard[s]' of one's employment. Were it otherwise, any injury associated with inherently dangerous work * * * could subject an employer to intentional tort liability, whatever the cause." Naragon v. Dayton Power Light Co. (March 30, 1998), Shelby App. No. 17-97-21. In determining whether the condition or procedure was indeed dangerous, "dangerous work must be distinguished from an otherwise dangerous condition within that work. It is the latter of which that must be within the knowledge of the employer before liability could attach."Naragon, supra, citing Brady v. Safety-Kleen (1991), 61 Ohio St.3d 624. It must be remembered that those injuries that occur in the normal scope of employment by definition are not intentional torts.
To determine whether the employer had knowledge that such condition or procedure was dangerous, we must determine whether the employer had actual knowledge of the dangerous condition. Fultz v. Baja Boats, Inc. (Feb. 18, 1994), Crawford App. No. 3-93-10. In this regard, "this is not the `reasonable person' standard for determining negligence or recklessness; that is, the fact that the employer should have known it was requiring the employee to work under such dangerous conditions that he would certainly be injured is not enough to establish a case in intentional tort. Rather the determination rests upon a claimant's alleging facts which show the employer's actual knowledge of the situation." Id.
Therefore, the scope of our inquiry must focus on whether Moebius has presented evidence from which it could be found that this was an injury associated with "inherently dangerous" work outside the scope of her employment and whether GM had knowledge that the work was dangerous. Moebius contends that the dangerous condition was the requirement that she work with rotating spindles, which are inherently dangerous, and the installation of the five-second delay on the safety cord, which GM had failed to inform her of prior to the accident.
Our review of the record leads us to conclude that the spindles, although dangerous, do not qualify as "inherently dangerous work" outside the scope of Moebius' employment. GM required its employees to work with the rotating spindles. In his deposition, Gudorf stated that he had installed the safety cord for safety reasons, to keep employee's hands out of the rotating spindles. However, the problem is that Gudorf admitted to Moebius that he had created a five-second delay of the safety device in order to increase production. Moreover, Glass admitted that he, Gudorf, Lane, and Spears had been aware of the alteration.
Additionally, a reasonable person could conclude that an employee who is used to working with, at most, a one — or two-second delay on a machine becomes accustomed to that delay. Changing the delay to five seconds is a substantial difference in terms of an employee who is accustomed to the shorter delay. The addition of three or four seconds, without educating the employee on this alteration, reasonably results in a dangerous condition which could make working with the spindles inherently dangerous beyond the normal scope of employment. Thus, the evidence before us, construed in a light most favorable to Moebius, supports the assertion that lengthening the delay to five seconds without informing Moebius created a dangerous condition. Furthermore, Gudorf's statement that he created the longer delay and Glass' statement that he, Gudorf, Lane, and Spears knew of the delay supports the assertion that GM knew of the dangerous condition. Therefore, we find that reasonable minds could differ in their conclusion as to this prong and that there is a genuine issue of material fact.
 Injury Is Substantially Certain
The second prong of the Fyffe test is whether the employer knew that if the employee was subjected to the dangerous condition, "then harm to the employee will be a substantial certainty." Fyffe, supra, at paragraph one of the syllabus. Substantial certainty is "greater than an employer's knowledge of a high risk of harm or danger." Cathey v. Cassens TransportCo. (Feb. 4, 2000), Union App. No. 14-99-35.
Moebius asserts that the record contains sufficient evidence to create a genuine issue of material fact as to whether GM knew injury to an employee was substantially certain to occur while operating the COE Machine after the safety device had been altered, when employees were not informed of the alteration.
A substantial portion of GM's argument centers around their contention that the stop cord was not a "safety device," and that the addition of the five-second delay does not constitute a "removal" of the safety device. The flaw in this argument is that if the stop cord would not qualify as a safety device, then GM should be found to have known that injury would be substantially certain to occur, as there would be no safety device present to protect its employees from the obviously dangerous rotating spindles. As such, we disregard this argument.
Additionally, GM argues that summary judgment was proper based upon the fact that there had been no previous injuries resulting from the altering of the safety device. GM maintains that Moebius failed to produce any evidence that GM knew of the substantial risk of injury prior to her accident.
The trial court in this instance found that Moebius' evidence on this prong consisted wholly of two incidents prior to her accident that involved people getting a shirt or gloves caught in the spindles subsequent to the alteration of the safety device. In his deposition, Lane testified to an incident prior to Moebius' accident, in which he entered the booth and tried to remove a part from a spindle without first pulling the safety cable on the COE Machine. He explained that he had felt his glove begin to wrap around the spindle and he had quickly removed his hand from his glove. He was not injured, and he could not recall if he had reported the incident to a supervisor. A second incident was reported by Victoria Renick in which Vickie Lehman had her shirt lodge in another COE Machine during operation. Renick believed that the incident occurred prior to Moebius' accident.
The trial court disregarded these incidents, finding them to be insufficient evidence that injury was substantially certain to occur. The trial court held that no evidence had been provided to indicate that either incident had been reported to GM and that the evidence presented failed to present a question of material fact as to whether GM knew that injury to Moebius was substantially certain to occur.
This argument, however, misses the mark. The trial court and GM are correct that the absence of prior injuries is a factor to consider in determining whether GM knew that Moebius' injuries were substantially certain to occur. Vermett v. Fred Christen Sons Co. (2000),138 Ohio App.3d 586, 603, citing Van Fossen, supra, at 118. While it is true that there were no prior injuries associated with the new stoppage delay, absence of a prior injury is not the sole factor in determining GM's knowledge. Cook v. Cleveland Elec. Illum. Co. (1995),102 Ohio App.3d 417, 429; Vermett, supra, at 603.
In this instance, we do not agree that, just because no one had previously been seriously injured, the situations were so dissimilar that they are irrelevant for summary judgment purposes to show that injury was substantially certain. They are incidents in which individuals narrowly escaped injury while in contact with moving spindles on the COE Machines. These "near misses" demonstrate that GM was aware that contact with the moving spindles could result in serious injury.
The question remains whether GM knew that injury was substantially certain to result from the dangerous condition. Lawrence Cunningham, the director for health safety and labor relations during the time of Moebius' accident, provided deposition testimony in this case. He stated that where a line has been operating for a period of time with an immediate stoppage of the line, the addition of a five-second delay would necessitate training for the employee who worked on the line.
In further support of Moebius' argument, she presents the deposition testimony of Gary Robinson, a safety expert, who concluded that the COE Machine was "defective and unreasonably dangerous." After investigating the situation, Robinson opined that Lane and Cunningham were aware that the rotating spindles and parts were hazardous and there had been an attempt to guard the machine. However, because there was no adequate point of operation device, and because at the time of the accident the safety cord had been defeated by the implementation of a five-second delay, a hazardous condition was created in which GM was substantially certain that injury would result to Moebius.
In this case, the primary safety device preventing injury from occurring due to the spindles was the safety cord, which immediately stopped the spindles from rotating upon being pulled. It is arguable that Moebius, who had worked on the line for some time, was accustomed to an immediate stoppage of the spindles. Construing the evidence most strongly in favor of Moebius, it is arguable that when this safety device was altered to stop after a five-second delay, injury would be substantially certain to occur to those employees who were not educated and trained on the presence of this delay.
Furthermore, Lane testified that he escaped injury when he attempted to grab the rotating spindles without first activating the stop cord. This serves as evidence that it is questionable whether GM ever instructed its employees never to place their hands near the rotating spindles, or whether such instruction, if provided, was sufficient.
In this case, there is a genuine issue of material fact because Moebius had not been warned of the delay or the removal of the safety cord. Reasonable minds could conclude that the accident was caused by the increase in the routine stop time, which was done by GM supervisors in an effort to increase production, and not by Moebius' normal actions of purging the spray guns.
Considering the sum of the evidence before us, we find that Moebius established a genuine issue of material fact regarding whether GM knew that injury to Moebius was a substantial certainty.
 Requirement that the employee perform dangerous work.
In the third prong, Moebius must establish a question of fact that she was required to perform the dangerous task. Moebius argues her operation of the COE Machine to remove the parts and the spindles prior to purging the spray gun, when a five-second delay had been implemented without her knowledge, represented the dangerous task. According to Moebius, the alteration of the safety device without her knowledge created a new and dangerous set of circumstances which did not exist when Moebius was first instructed to operate and purge the COE Machine. Because she had not been advised that upon pulling the safety cord, the spindles would rotate for five seconds rather than stop almost immediately as they had in the past, she was required to work with a dangerous condition.
GM contends that Moebius has to demonstrate that GM directed her to purge the spray guns in the exact manner that caused her injury. Because GM never instructed Moebius to grab the rotating spindles, GM argues that she has failed to meet the requirements of this prong.
GM does not dispute that Moebius was required to operate the COE Machine. Moebius was required, as part of her job, to purge the spray guns when they became clogged. We also find that there is evidence in the record to support her theory that she followed the method in which she had been trained on the COE Machine.
There is evidence in the record that Moebius received inadequate training on the COE Machine. In her deposition, Moebius testified that she was trained on the use and operation of the COE Machine by way of watching her supervisors operate the COE Machines. GM argues that it should not be held responsible for Moebius' actions in "disregard[ing] her training." However, it appears as though the movement and process of purging the spray guns was very rhythmic, and it was the rhythm of the process, not the actual safety procedure, that Moebius was taught. Indeed, during her informal training, Moebius watched as her supervisors purged the spray guns without touching the rotating spindles. No one stated that she had been told, at any point, not to place her hands near the rotating spindles. Instead, she was taught the process of purging, without any effort to educate her on the dangers of the machines. She was not provided with a safety manual. She did attend safety classes at GM, however the procedures learned in that class, such as the "lockout-tagout" method in which to shut down the machines, did not apply to the COE Machines.
In light of the above discussion, we believe that Moebius has satisfied her burden of setting forth specific facts which show that there is a genuine issue as to whether GM committed an intentional tort. Accordingly, her second assignment of error is sustained.
Having found that summary judgment was improperly granted, we reverse and remand for further proceedings consistent with this opinion.
FAIN, J. and GRADY, J., concur.
[1] Throughout the record, various individuals refer to the time period between the pulling of the E-cord and the termination of the rotation as being almost immediate. However, occasionally an individual notes that the rotation might continue for a period of one to two seconds. Regardless, there was not much delay between the pulling of the E-cord and the termination of the rotation of the spindles and their accompanying parts.