**VERMETT et al., Appellants,**

v.

**FRED CHRISTEN & SONS COMPANY et al., Appellees.**

[Cite as *Vermett v. Fred Christen & Sons Co.* (2000), 138 Ohio App.3d 586.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–99–1166.

Decided Aug. 25, 2000.

*Steven P. Collier, Sarah S. Riordan* and *Anthony E. Turley,* for appellant Chad Vermett.

*Robert M. Scott,* for appellant Wendy Vermett.

*James R. Jeffer* and *Douglas A. Spidel,* for appellee Fred Christen & Sons Company.

*David M. Jones* and *M. Charles Collins,* for appellee Wysong & Miles Company.

*Ronald V. Rawlin,* for appellee Linemaster Switch Corporation.

KNEPPER, Presiding Judge.

This is an appeal from the judgment of the Lucas County Court of Common Pleas granting appellees' motions for summary judgment. For the following reasons, we affirm in part and reverse in part the judgment of the trial court.

Chad K. Vermett ("appellant"), was injured on October 24, 1994, while working at a metal fabricating shop owned and operated by Fred Christen & Sons Company ("FC&S"). At the time of his injury, appellant was working on a press brake machine manufactured by Wysong and Miles Company ("Wysong"). The press was activated through the use of a foot pedal/switch, manufactured by Linemaster Switch Corporation ("Linemaster"). Appellant's injury occurred when the press cycled while his hand was inside the press's point of operation.[1] According to appellant, he had reached into the die area to dislodge a piece of

---

1. Point of operation is also know as the pinch point or die area.

metal that was stuck. He testified that his foot was not on the pedal when the press cycled and he denied having depressed the switch, a.k.a. treadle.

Appellant had worked only a couple of months at FC&S at the time of his accident. On the day in question, appellant was trained in the morning on the press between fifteen minutes and two hours. Appellant had never operated any press in the shop by himself prior to the day of the accident; however, his foreman, Richard Knak, testified that appellant had assisted him with three or four other press jobs. Appellant had formed numerous pieces in the morning, took a lunch break, and was injured shortly after lunch.

It is undisputed that appellant was shown by Knak and his supervisor, Michael Brickner, how to place pieces of steel into the press and operate the foot pedal. Both testified that they instructed appellant never to put his arm or anything through the front of the press. This practice was corroborated by Mark Ryan, Jr., an employee and operator of the press, who testified that, when he was a new employee, he also was told to never stick his fingers or hands into the die area.

Appellant, however, was not instructed how to set up the press or use its computer, was not told how to remove any pieces of steel that may become stuck, and was not provided any hand tools, as none were used.[2] Brickner and Knak both testified that items never got stuck, so appellant was not instructed regarding what to do in such an event. However, Knak testified that he did instruct appellant to seek help if anything got stuck.

Regarding FC&S's practice concerning stuck pieces, Ryan, who was trained on all aspects of the press's operation, testified that he was instructed by Knak to put blocks in the press brake if anything became stuck so that the press would not come down on him while he was in the die area. Ryan, however, testified that he never had to do this and that, even with blocks in the press, he would still never stick his fingers or hands into the die area.

The press had a "PRESS BRAKE SAFETY" manual ("safety manual") which was never gone over with appellant. Brickner testified that the safety manual was not gone over with appellant because "[b]eing his operation was just to form and that was it, we highlighted all the parts that we wanted to highlight on him about."

In his deposition, appellant testified that he did not recall being instructed to keep his hands out of the die space and did not recall the written warning on the front of the press facing the operator at eye-level, which stated, "NEVER

---

**2.** Training on the operation of all aspects of the press takes approximately one week, according to Mark Ryan, Jr., who was fully trained on all aspects of the press's operation.

PLACE ANY PART OF YOUR BODY AT THE POINT OF OPERATION (UNDER THE RAM OR WITHIN THE DIE AREA)." Appellant testified:

"Q. * * * Up to the point where Mr. Brickner says do it yourself and he leaves, had he said anything to you at all about keeping your hand out of the die area?

"A. No.

"Q. No?

"A. Not that I can recall.

"Q. I want to make sure I understand that. He's told us that he did tell you that, and so my question is are you sure he did not or you just can't recall?

"A. I cannot recall.

"Q. Did he point out any of the signs on the machine to you?

"A. Not that I'm aware of.

"Q. Is your answer the same as it was for the last one, he may have, you just can't recall?

"A. Yes."

Appellant further testified that he placed his hand in the die area because a piece had become stuck. He stated that placing his hand in the press was the only way he knew of to get the piece out. Appellant testified as follows:

"Q. What was your understanding of putting your hand into the press point where the machine comes down and bends the part? Did you have any thought about that at all? You say no one said anything to you; isn't that what you're telling me?

"A. Yeah.

"Q. Did you have any conclusions about that?

"A. I just—I—at the time I did what I—I don't know. I just thought I'd do what I thought was right. I don't know. I just—

"Q. You'd do what you thought was—was there any reason as far as you're concerned that your hand for any reason at all would go into the pinch point where the press comes down on the part? Any reason for your hand to go in there?

"A. When the piece got stuck, when a piece got stuck, yeah.

"Q. Why would you put your hand in there when the piece got stuck?

"A. That's the only way I knew of to get it out.

"Q. Who told you to do that?

"A. I can't recall of anyone saying that right offhand.

"Q. Well, how did you come to that conclusion then?

"A. Because the only way I knew of operating the press was by the pedal, and I took my foot off the pedal and went inside with my hand to pull that piece out, and I figured if my foot was off the pedal, it would not cycle. And when I reached in there to grab it, it cycled. That's the only thing I knew about the press."

There was no point-of-operation guarding on the press being used during appellant's job to prevent his hands from being inside the press when it cycled. There was a dual palm system attached to the press; however, it was not being used for appellant's particular job. Wysong's safety manual stated that the "[d]ual palm buttons should be used to activate the ram when the piece parts are small and the operator has to stand close to the point of operation." Both Brickner and Knak testified that the dual palm system could not be used for the part being pressed by appellant because the items had to be balanced until the ram came down to balance the piece.[3] Potentially, the press could have had a table bolted to the front that could have been used to balance the item being pressed, thereby allowing the dual palm system to be used; however, the press was never equipped with such a table. Ryan also testified that wrist guards could have been used with the job appellant was performing; however, wrist restraints were not added until after appellant's injury.

Richard Stein, consultant for Wysong, testified that the press could not be equipped with universal point of operation safeguarding due to the infinite jobs for which the press could be used. The safety manual, however, stated that "[p]roper point of operation safeguarding is a must with each type of press brake." The safety manual further stated:

"ANSI B11.3 states that the employer is to evaluate each operation before any material is formed to determine if a point of operation guard or device can be used to protect the operator (and/or helper) from injury near or within the point of operation of your press brake. If a point of operation guard or device can be used, it *shall* be used." (Emphasis *sic.*)

The warning label on the press itself stated, "**NEVER** OPERATE MACHINE WITHOUT PINCH POINTS GUARDED AND WITHOUT ADEQUATE POINT OF OPERATION SAFEGUARDING."

---

3. The press was programmed for a two-step process. The steel was manually held in place against the back gauge or stop; otherwise the steel would simply fall out of the press. The foot pedal would then be depressed for the first step. It would come down quickly until that last half inch or so and then very slowly come down to a point where it could hold the steel in place without the operator holding it. Then the foot pedal would be depressed for the second time, which caused the ram to come down and fold the steel.

Brickner testified that he had not read the safety manual prior to the accident and that point-of-operation guarding on the press was never discussed. Knak also testified that the press was never evaluated for point-of-operation safeguarding, although he was aware that wrist restraints would have to be added to all the presses at some point.

Knak further testified that when the personnel from Wysong trained him on the operation of the press, no point-of-operation guarding was discussed. Knak stated that he did not inquire about other safeguards because he did not think there were any. There was no point-of-operation safeguarding on any other machines at the time of the purchase of the Wysong press. Additionally, Stein testified that Wysong representatives did not always use point-of-operation guarding when demonstrating their press brakes at trade shows, did not insist on this guarding when setting up a machine and instructing owners and operators in its use, and, in fact, were not trained regarding point-of-operation safeguarding.

With respect to appellant's job in particular, Knak testified that he did not consider the pinch point to present a danger because appellant's hands were not required to be directly underneath the pinch point at any time during the press's operation:

"Q. Now, third from the bottom on the left-hand side is the statement never operate press brake without pinch points guarded and without adequate point of operation safeguarding. Was it your opinion before [appellant's] accident that that part of this list of things never to do applied to the use of the Wysong press?

"A. Well, to me there was no pinch point for him because his hands were far enough away. Pinch point to me is something that where your fingers are going to be right directly underneath—right underneath the die. It don't have to be— not under the die, it could be under the metal too, that's a pinch point. The ram comes down and you could be on the edge of the thing, that's a pinch point.

"But he was plenty far enough away, and I've always told them never stick— don't ever stick your hands in there. Being that that piece is big enough, his hands shouldn't have never been within reach of that thing."

Alfred DiBonaventura, an employee of Linemaster, testified that the model foot pedal FC&S had was manufactured with a warning label that stated, "This foot switch should only be used where point of operation guarding devices have been properly installed so that it is impossible for the operator's hands or fingers to remain within the point of operation during the actual machine cycle." This warning, however, was not on the foot pedal during an inspection in 1995. Nevertheless, Knak testified that originally there was written material on the foot switch, although he did not recall its content. It is undisputed that it is dangerous

to operate the press with a foot pedal without adequate point-of-operation safeguarding.

In 1992, a safety survey was conducted at FC&S by an Industrial Safety Consultant, with the Division of Safety and Hygiene, Ohio Bureau of Workers' Compensation. Item twelve of the report indicated that the point of operation was not guarded on certain press brakes; however, the Wysong press was never specifically mentioned. Following appellant's injury, OSHA investigated the incident. As a result, on March 3, 1995, OSHA issued citations that stated that FC&S failed to provide a place of employment "free from recognized hazards that were causing or likely to cause death or serious physical harm to employees" for its failure to provide point-of-operation guarding, adequate training regarding safe operating procedures, or regularly scheduled inspections.

William Murray, Jr. testified on appellant's behalf that based on his engineering and safety education and training experience, his training and knowledge of machine guarding, and his review of the evidence, he opined that FC&S knew of a dangerous condition or instrumentality, knew that subjecting appellant to the condition and/or instrumentality resulted in a substantial certainty of harm, and that FC&S required appellant to perform the dangerous task. Murray based his opinion on the fact that there was no point-of-operation safeguarding; Brickner had not been formally trained on the subject of press brakes, had not read the safety manual, and was not aware of the safety standards of the American National Standards Institute ("ANSI"); the press was not evaluated for point-of-operation safeguarding; appellant was provided inadequate training in that he was not required to read the safety manual, was not instructed on the use of the palm pedestal controls or the computer keyboard, and was not given any hand tools; and Knak had no knowledge of point-of-operation safeguards at the time of the accident.

Appellant and, his now ex-wife, Wendy Vermett,[4] sued FC&S, Wysong, Linemaster, and Glenn H. Carlson, M.D. Dr. Carlson was voluntarily dismissed and is no longer a party to this action. Appellant brought suit against FC&S, claiming employer intentional tort; Wysong, claiming product defects, with respect to the press, and failure to warn; and Linemaster, claiming product defects with respect to the foot pedal. Mrs. Vermett sought loss of consortium.

FC&S, Wysong, and Linemaster each filed motions for summary judgment, which were decided by the trial court on November 6, 1997, in three separate judgment entries. Appellants and Linemaster filed several motions for reconsideration, which were denied by the trial court. On April 30, 1999, appellants

---

4. Collectively, Mr. and Mrs. Vermett will be referred to as "appellants," otherwise, any reference to "appellant" applies to Mr. Vermett alone.

dismissed, pursuant to Civ.R. 41(B)(1), the remaining claims against Wysong and Linemaster, which were stated as follows:

" * * * (1) by Chad K. Vermett against Wysong & Miles Company, for defects in manufacture or construction (part of Third Claim for Relief); (2) by Chad K. Vermett against Wysong & Miles Company, for failure to conform to express and implied representations (Fifth Claim for Relief); (3) by Chad K. Vermett against The Linemaster Switch Corporation, for defects in manufacture or construction and defects in design or formulation (part of Seventh Claim for Relief); and (4) by Wendy Vermett for her loss of consortium as it relates to the claims of Chad Vermett as identified in (1), (2) and (3) above."

As part of this dismissal, the trial court held that the decisions granting in part and denying in part the motions for summary judgment were thereby made final judgments.

Appellants appealed the trial court's decisions concerning summary judgment and raise the following assignments of error:

"1. The trial court erred in granting the motion for summary judgment of defendant Fred Christen & Sons Company.

"2. The trial court erred in granting partial summary judgment to defendant Wysong & Miles Company.

"3. The trial court erred in granting partial summary judgment to defendant Linemaster Switch Corporation.

"4. The trial court erred in denying plaintiff's motion for reconsideration of first opinion and judgment entry.

"5. The trial court erred in denying plaintiff's motion for reconsideration of second opinion and judgment entry.

"6. The trial court erred in denying plaintiff's motion for reconsideration of third opinion and judgment entry."

This court notes at the outset that in reviewing a motion for summary judgment, we must apply the same standard as the trial court. *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 129, 572 N.E.2d 198, 199–200. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).

## A. APPELLANT'S CLAIMS AGAINST FC&S

■ The Ohio Workers' Compensation Act provides that a participating employer shall not be liable to respond in damages at common law or by statute for

death, injuries, or occupational disease of its employees. Section 35, Article II, Ohio Constitution. This immunity does not apply when an employer intentional tort has occurred within the context of the employer/employee relationship. *Blankenship v. Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St.2d 608, 23 O.O.3d 504, 433 N.E.2d 572, syllabus.

■ To establish an employment intentional tort, an employee must prove by clear and convincing evidence that the employer deliberately committed all of the elements of an employment intentional tort. R.C. 2745.01(B). An employment intentional tort "means an act committed by an employer in which the employer deliberately and intentionally injures * * * an employee." R.C. 2745.01(D)(1). Accordingly, the focus in *Blankenship* and its progeny is on the proof required to establish intent for the purpose of showing that an employer committed an intentional tort against its employee. See, *e.g.*, *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 109, 522 N.E.2d 489, 498. In *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraph one of the syllabus, the Ohio Supreme Court established the following three elements necessary to prove the existence of an employer's intentional tort: "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task."

■ In setting forth the proof required to establish intent, the *Fyffe* court held that "mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent." *Id.* at paragraph two of the syllabus. Rather, it must be shown that the probability of certain consequences is such that the "employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds * * *." *Id.* Only in these circumstances, will intent be inferred from the employer's knowledge of all the facts and circumstances which create the risk. *Emminger v. Motion Savers, Inc.* (1990), 60 Ohio App.3d 14, 16, 572 N.E.2d 257, 259–260.

■ An employer can fail to take corrective action, institute safety measures, or properly warn the employees of the risks involved, and still not be liable for an intentional tort:

"There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness

on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an 'intentional tort' and therefore an exception, under *Blankenship* or *Jones [v. VIP Development Co.* (1984), 15 Ohio St.3d 90, 15 OBR 246, 472 N.E.2d 1046], to the exclusivity of the Act." *Van Fossen*, 36 Ohio St.3d at 117, 522 N.E.2d 489.

■ Accordingly, to withstand a motion for summary judgment, the injured employee must set forth specific facts that raise a genuine issue of material fact as to each element of the *Fyffe* three-prong test. See *Van Fossen v. Babcock & Wilcox Co.*, at paragraph seven of the syllabus.

The trial court held that a genuine issue of material fact existed with respect to the first element of the *Fyffe* three-prong test, *i.e.*, whether FC&S had knowledge of a dangerous condition. However, the trial court found that appellants failed to establish a genuine issue of material fact as to the second or third prongs, *i.e.*, whether FC&S knew that harm to appellant was a substantial certainty if appellant was subjected by his employment to such dangerous process, procedure, instrumentality, or condition, and whether FC&S required appellant to continue to perform the dangerous task.

On appeal, appellants argue that the trial court erred in finding that there were no genuine issues of material fact as to the second or third elements of the *Fyffe* standard. Specifically, appellants argue that, under the totality of the evidence presented and after viewing all the evidence in favor of appellants, a reasonable juror could find that FC&S knew that injury to appellant was a substantial certainty, and that FC&S required appellant to perform a dangerous task despite such knowledge.

Appellants rely on a number of factors which they consider establish an employer intentional tort, such as:

"(1) appellant had only been employed by FC&S for two and one-half months at the time of his injury;

"(2) he had never worked a press brake before the day of the accident;

"(3) appellant was instructed to operate the press without adequate training (15–20 minutes, rather than the three days recommended by Wysong, or the week's worth of training provided other FC&S employees);

"(4) appellant did not recall being told not to put his hand into the point of operation;

"(5) appellant's supervisor never told appellant what to do if a piece became stuck in the pinch point or die area;

"(6) appellant understood that when a piece became stuck in the die area, the only way to remove it would be to reach into the pinch point or die area;

"(7) there was no safeguarding to prevent an operator from placing his or her hands in the die area because a foot switch was used, rather than a dual palm control;

"(8) Wysong 'encouraged' its customers to obtain separate point of operation guarding, including dual palm buttons, to safeguard against injury, although no such safeguarding was demonstrated to FC&S during training;

"(9) Linemaster's chief engineer, Alfred R. DiBonaventura, testified that use of the Linemaster foot switch without point of operation safeguarding created a situation where harm to an employee was a substantial certainty;

"(10) a Division of Safety & Hygiene Safety Consultant, Douglas Farnsworth, identified that the point of operation on the press brake was not guarded and suggested that FC&S 'install a point of operation guard or device or a combination guard and device to protect the operator and other workers from injury';

"(11) although FC&S's supervisor, Brickner, was not aware of the ANSI standards, ANSI standard B11.3 provides that an employer shall provide safeguarding at the point of operation during the power press brake cycle;

"(12) Brickner agreed that foot control devices should only be used when point of operation and pinch point guarding devices have been properly installed and are utilized so that it is impossible for the operator's hands or fingers to remain within the point of operation during the machine cycle;

"(13) the job appellant performed could probably have been done with wrist restraints or with dual palm buttons;

"(14) the press brake's safety manual was never discussed with appellant;

"(15) although FC&S claimed to have a 'safety policy' to follow when a piece of metal got stuck in the machine, there was no evidence that appellant was taught this policy;

"(16) OSHA investigated the incident and issued a Citation and Notification of Penalty to FC&S, stating that FC&S has a 'Serious' violation insofar as it failed to provide a place of employment 'free from recognized hazards that were causing or likely to cause death or serious physical harm to employees';

"(17) appellant's expert, William M. Murray, Jr., attested that FC&S's knowledge of the hazard posed by the unguarded press, its failure to evaluate for safeguarding, its failure to train appellant adequately, and its failure to provide appellant with hand tools or other means to deal with a stuck part combined to create a substantial certainty of harm; and

"(18) according to Wysong's expert, Stein, with proper training, appellant's injuries could have been avoided altogether."

Generally, these factors can be placed into three categories: (1) appellant received inadequate training, for a new, inexperienced employee; (2) FC&S failed to be aware of and provide point-of-operation guarding, in violation of applicable safety standards and contrary to manufacturer warnings; and (3) OSHA issued a citation, stating that FC&S failed to provide a place of employment "free from recognized hazards that were causing or likely to cause death or serious physical harm to employees."

In response, FC&S asserts that the trial court correctly found that appellants failed to establish a genuine issue of material fact with respect to whether FC&S knew to a substantial certainty that appellant would be injured in a manner similar to that which caused his injuries. FC&S argues that the following establishes that it did not know that appellant's injuries were a substantial certainty: (1) there had never been any other injuries; (2) appellant ignored Knak's and Brickner's instruction to keep his hand out of the die area and to get their assistance if the press was not working properly; (3) there was no evidence that reaching into the press was an acceptable method of operating the press, or that appellant had seen other employees place their hands within the press; (4) appellant received adequate training and warning for the limited job of "feeder," which he was asked to perform; (5) FC&S's unfamiliarity with the safety manual and safety standards did not establish that FC&S was substantially certain that injury would occur; and (6) OSHA violations are not a proper basis for civil liability and such evidence is insufficient to establish even negligence *per se.*

Considering the sum of the evidence, we find that appellants established a genuine issue of material fact regarding whether FC&S knew that injury to appellant was a substantial certainty. It is undisputed that warnings and literature from Wysong instructed that the press should never be operated without "adequate point of operation safeguarding." Both Knak and Brickner testified that they were aware of this warning, yet such safeguarding was never discussed or implemented at FC&S. Although it is undisputed that no "universal" safeguarding could be affixed to the press, at a minimum, the evidence indicates that, wrist restraints could have been used in conjunction with appellant's job, or by adding a support table, the dual palm buttons could have been used.

We also find that based on the facts in this case, it is questionable whether appellant received adequate training. FC&S asserts that appellant received adequate training for the job of feeder and, as such, did not require a full week's worth of training. FC&S, however, did not discuss with appellant the proper procedure to follow if an item became stuck. Both Knak and Brickner testified that they instructed appellant never to put his arm in the press and to get help if needed. However, based on appellant's actions and method of removing the stuck

piece, it is questionable whether he was instructed in this regard, or whether the instructions were sufficient.

■ FC&S argues that injury to an employee is not a substantial certainty when the injury results from the employee's violating an established safety procedure. See *Ortiz v. Elyria Foundry Co.* (Oct. 21, 1992), Lorain App. No. 92CA005302, unreported, 1992 WL 308556. We find, however, that it is unclear whether appellant knew or appreciated the established safety procedure. Moreover, we find that FC&S is not summarily relieved from liability because appellant reached into the press when FC&S ignored safety warnings to provide adequate point-of-operation safeguarding on this type of repetitive activity. Further, although appellant was not instructed to place his hand inside the press, FC&S could have anticipated that an inexperienced, minimally trained employee, could act in the manner appellant did. Accordingly, we find *Sanek v. Duracote Corp.* (1989), 43 Ohio St.3d 169, 539 N.E.2d 1114, *Youngbird v. Whirlpool Corp.* (1994), 99 Ohio App.3d 740, 747, 651 N.E.2d 1314, 1318–1319, and *Brunn v. Valley Tool & Die, Inc.* (Nov. 9, 1995), Cuyahoga App. No. 68811, unreported, 1995 WL 662115, distinguishable on the facts from this case.

With respect to the OSHA violation, we note that the Ohio Supreme Court clearly held that "Congress did not intend OSHA to affect the duties of employers owed to those injured during the course of their employment." *Hernandez v. Martin Chevrolet, Inc.* (1995), 72 Ohio St.3d 302, 303, 649 N.E.2d 1215, 1216. As such, the OSHA violation issued after the incident does not weigh into our consideration of whether FC&S knew appellant's injuries were a substantial certainty. However, we do find significant the fact that, prior to the incident, FC&S was notified by the Ohio Bureau of Workers' Compensation of potential safety hazards, including lack of point-of-operation guards on the presses. Moreover, Knak even testified that he was aware that wrist restraints would have to be added to all the presses; however, none was added until after appellant's accident. This evidence shows that FC&S was on notice that injury was substantially certain to occur.

■ Appellee is correct that the absence of prior injuries is a factor to consider in determining whether FC&S knew that appellant's injuries were substantially certain to occur. See *Van Fossen, supra,* at 118, 522 N.E.2d at 505–506. However, absence of a prior injury is not the sole factor in determining an employer's knowledge. *Cook v. Cleveland Elec. Illum. Co.* (1995), 102 Ohio App.3d 417, 429, 657 N.E.2d 356, 363–364. It is true that there were no prior injuries associated with the press since FC&S acquired it in 1990; however, this does not negate the other evidence in this case.

■ Based on the foregoing, we find that reasonable minds could conclude differently regarding whether FC&S knew that appellant's injuries were a substantial certainty. FC&S knew the press should not be operated without adequate point-of-operation guarding, yet none was added, and FC&S knew that appellant had never operated a press on his own before, yet it is questionable whether he received adequate instruction. As such, we find that genuine issues of material exist with respect to the second prong of the *Fyffe* analysis. Additionally, insofar as FC&S required appellant to perform his job on an unguarded press, arguably without sufficient training, we find that there are genuine issues of material fact with respect to the third prong of the *Fyffe* analysis.

Accordingly, we find that the trial court erred in granting FC&S's motion for summary judgment and denying appellants' motion for reconsideration. Appellants' first and fourth assignments of error are therefore found well-taken.

## B. APPELLANTS' CLAIMS AGAINST WYSONG

Appellants asserted a products liability action against Wysong, pursuant to former R.C. 2307.75(A), alleging that the press brake was defective in its manufacture or construction, its design or formulation, and, pursuant to R.C. 2307.76, alleging inadequate warnings or instructions. Former R.C. 2307.75(A) stated as follows:

"(A) Subject to divisions (D), (E), and (F) of this section, a product is defective in design or formulation if either of the following applies:

"(1) When it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to division (B) of this section exceeded the benefits associated with that design or formulation as determined pursuant to division (C) of this section;

"(2) It is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner."

R.C. 2307.76(A) states:

"(A) Subject to divisions (B) and (C) of this section, a product is defective due to inadequate warning or instruction if either of the following applies:

"(1) It is defective due to inadequate warning or instruction at the time of marketing if, when it left the control of its manufacturer, both of the following applied:

"(a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;

"(b) The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm."

Wysong moved for summary judgment, which was granted by the trial court on the claims of defective and negligent design and inadequate warnings. Wysong's motion for summary judgment on the claim of manufacturing defect was denied by the trial court and appellants' claim alleging a failure to conform to express and implied representations was not addressed by the court; later, both of these claims were dismissed by appellants. Appellants' subsequent motion for reconsideration was denied. In ruling on appellants' motion for summary judgment, the trial court held that William Murray was not qualified to render any expert testimony in this matter because he did not possess the requisite knowledge, skill, experience, training, or education required by Ohio law.

■ Accordingly, we must first review the trial court's decision to exclude Murray's testimony. The decision of the trial court will not be overturned absent an abuse of discretion. *Calderon v. Sharkey* (1982), 70 Ohio St.2d 218, 24 O.O.3d 322, 436 N.E.2d 1008, syllabus; *Vinci v. Ceraolo* (1992), 79 Ohio App.3d 640, 646, 607 N.E.2d 1079, 1082–1083. Thereafter, we will review the trial court's grant of summary judgment.

a. Murray's Qualification as an Expert

Evid.R. 702 sets forth when a witness may testify as an expert:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *"

■ First, however, the trial court must make a determination concerning the proposed individual's qualification(s) to testify as an expert witness. *Scott v. Yates* (1994), 71 Ohio St.3d 219, 221, 643 N.E.2d 105, 106–107.

■ To qualify as an expert the witness need not be the best witness on the subject, but must demonstrate some knowledge on the particular subject superior to that possessed by the trier of fact. *Id.* "The qualification of an expert

depends upon the expert's possession of special knowledge that he or she has acquired either by study of recognized authorities on the subject or by practical experience that he or she can impart to the trier of fact." *In re John B.* (May 8, 1998), Lucas App. No. L–97–1165, unreported, 1998 WL 290230, citing, *Ishler v. Miller* (1978), 56 Ohio St.2d 447, 453–454, 10 O.O.3d 539, 542–543, 384 N.E.2d 296, 300–301. Neither special education nor certification is necessary to confer expert status upon a witness. *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128, 133–134; citing, *State v. Boston* (1989), 46 Ohio St.3d 108, 119, 545 N.E.2d 1220, 1231–1232. In fact, a witness can qualify as an expert, even if not a specialist in a particular area of a field of expertise so long as he or she is familiar with the field of expertise. *Vistein v. Keeney* (1990), 71 Ohio App.3d 92, 99, 593 N.E.2d 52, 56–57.

 We agree with the trial court that Murray lacked specialized knowledge in press brake operation and safeguarding and, therefore, is not qualified to render expert testimony regarding Wysong's failure to provide point-of-operation safeguarding or adequate warnings. See Evid.R. 702. Murray never received formal training regarding press brakes and, while on the job, although he observed others, he never operated press brakes and never dealt with safeguarding of press brakes. Murray's knowledge regarding press brake safety and point of operation guarding was obtained while working as a safety consultant at the consulting firm of Gary Robinson, Inc. ("GRI"), where he worked since 1993. In that capacity, he attended several seminars covering general industrial machine safety, wherein press brake safety was touched upon; however, he was not given any materials on the subject. Murray also did limited research on industry standards for press brakes and press brake guards for Gary Robinson at GRI, who was giving expert testimony in two other press brake cases. However, he "didn't do an awful lot of work" on either case. Prior to this case, Murray never inspected a press brake and had never acted as an expert on the adequacy of warnings. Murray seems most knowledgeable in the area of meat grinder safety; however, there is no ANSI safety standards that apply to meat grinders and the guarding of meat grinders is dissimilar to the guarding of press brakes, in that they do not involve the use of pull-backs, wrist restraints, or light curtains.

The trial court thoroughly considered Murray's background and found him to be unqualified as an expert with respect to press brakes. The trial court found that, although Murray's experience may qualify him as an expert on "identifying general industrial hazards and recognizing a need for safeguards," he was not qualified "as an expert on press brake operation and design, on the point of operation guarding that must be provided by a manufacturer, or on the adequacy of warnings provided by a manufacturer." Based upon our review of Murray's educational background, employment experience and expertise, we find that the

trial court did not abuse its discretion in determining that Murray lacked the specialized knowledge necessary to qualify him as an expert in this case. See *Vistein,* 71 Ohio App.3d at 98–99, 593 N.E.2d at 56.

b. Defective Press

Wysong asserts that the press falls within one of the exceptions to the strict statutory liability imposed for a defective product by former R.C. 2307.75(A)(1) and (2). Specifically, Wysong relies on former R.C. 2307.75(E) and (F), which state:

"(E) A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

"(F) A product is not defective in design or formulation if, at the time the product left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which the claimant seeks to recover compensatory damages without substantially impairing the usefulness or intended purpose of the product, unless the manufacturer acted unreasonably in introducing the product into trade or commerce."

Richard Stein, Wysong's consultant, provided the relevant testimony concerning the design of the press based upon a reasonable degree of scientific certainty. Stein testified that the press was designed and constructed within ANSI standards, and installed consistent with industry standards. He also testified that the press was shipped with "all the possible guards that the manufacturer can provide that he knows may be a potential hazard." Stein further testified that Wysong was unable to provide a point-of-operation safeguard that protects the user during all possible uses because there is an "infinite variety" of tools and applications which the press could accommodate. Only if the press was changed in "its designation from a universal machine to a special purpose machine" could it be equipped with appropriate point-of-operation safeguards. Additionally, we note that, contrary to appellants' assertion, Wysong did provide limited point-of-operation safeguarding in the form of a dual palm system; however, we recognize that there was no point-of-operation guarding on the machine to be used with the foot pedal that was added to the machine.

Accordingly, based on Stein's testimony, we find that the press could not have been equipped with a safety feature that safeguarded it during all possible uses because of the variety of sizes and shapes of the work pieces concerned. We

therefore agree with the finding of the trial court that harm to appellant was caused by an inherent characteristic of the product that could not have been eliminated without substantially compromising the product's usefulness or desirability. See R.C. 2307.75(E). We further find that the trial court correctly found that a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which appellants sought to recover compensatory damages without substantially impairing the usefulness or intended purpose of the machine. See R.C. 2307.75(F).

■ Appellants, however, assert that the press was defective because Wysong knew how the machine would be used and knew that safeguards could have been used on the particular piece appellant was pressing. We disagree that this would render the press defective by design or formulation. Stein clearly determined, after-the-fact, that there were potential point-of-operation guards that could have been used on appellant's particular job; however, his opinion does not negate his testimony that, because of the variety of pieces that could be formed on the press, there was no way Wysong could equip the press with a method of safeguarding that would protect a user under all circumstances.

■ Appellants also argue that Wysong's failure to train FC&S employees on point of operation guarding "implicitly informed FC&S that use of the press without pinch point guards was safe despite admonitions to the contrary in the written materials." It is undisputed that Wysong's representatives did not discuss the variety of point-of-operation guards available; however, Stein testified that the press was installed and put into service consistent with industry standards. Moreover, Wysong's training sufficiently warned appellant's supervisors regarding the hazards posed by the point of operation. Brickner, Knak and Ryan all testified that they knew never to place any body part within the die area and Brickner and Knak testified that they also warned appellant of this. Furthermore, the safety manual discussed at length the variety of safeguarding tools that could be added to the machine to enhance safety.[5] Knak testified that he reviewed the safety manual when the press was first purchased. Accordingly, we

---

5. Page five of the safety manual stated:

"The object of providing safeguarding should be to prevent the operator (and/or helper) to place any part of his body within the point of operation. Remember, there is no universal safeguard for all press brake applications. Different safeguarding arrangements may be required for each separate application. Each guard or device appropriate for use must be maintained and adjusted in accordance with the manufacturer's instructions."

A list was then provided of types of safeguards available, *i.e.*, presence sensing devices, pullbacks and restraints, drop gate guards, dual palm buttons, hand tools, and the companies that sell them. The safety manual even encouraged the purchaser to contact the National Safety Council, American National Standards Institute, Worker's Compensation Carrier, the Wysong Distributor, their local Occupational Safety Office, and local Safety Equipment Supplier, "regarding safe press brake operations."

find that Wysong is entitled to summary judgment regarding appellants' R.C. 2307.75 claim.

We further find that there is no genuine issue of material fact regarding whether Wysong was negligent in its design of the press. "The common-law action of negligent design survives the enactment of the Ohio Products Liability Act, R.C. 2307.71 *et seq.*" *Carrel v. Allied Products Corp.* (1997), 78 Ohio St.3d 284, 677 N.E.2d 795, paragraph one of the syllabus. A product is defective in design "if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or if the benefits of the challenged design do not outweigh the risk inherent in such design." *Knitz v. Minster Machine Co.* (1982), 69 Ohio St.2d 460, 23 O.O.3d 403, 432 N.E.2d 814, syllabus. See, also, *Perkins v. Wilkinson Sword, Inc.* (1998), 83 Ohio St.3d 507, 700 N.E.2d 1247. The standard applied is "one appropriate to the law of negligence: ' "* * * [i]t is the duty of a manufacturer to use reasonable care under the circumstances to so design his product as to make it not accident or foolproof, but safe for the use for which it is intended. * * * [Citation omitted.]" ' *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 326 [4 O.O.3d 466, 471], 364 N.E.2d 267 [273]." *Knitz* at 464, 23 O.O.3d at 405, 432 N.E.2d at 817. Further, in considering the reasonableness of a manufacturer's design choice, we are to look to statutory regulation. *Id.*

In this case, Stein testified that the press was manufactured within the guidelines of applicable safety standards, specifically ANSI, and within industry manufacturing standards. Although not "statutory" in nature, like the trial court, we find that Wysong's compliance with ANSI is a compelling factor. Additionally, we find that Wysong used reasonable care in designing its press. Stein testified that due to the press's "universal" nature, Wysong was unable to provide safeguarding for the infinite variety of uses. The dual palm system was installed for small work pieces, where an operator's hands would be close to the die area, and the employer was instructed in the safety manual to seek out additional safeguarding provisions for other types of jobs, which Wysong could not anticipate. Further, there is no showing that the press was more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or that the benefit of having a universal machine does not outweigh the risk inherent in such design.

Ultimately, the duty is with the employer to insure that appropriate safeguarding methods are implemented. As mentioned above, ANSI B11.3 states that it is the employer's responsibility to evaluate whether a point-of-operation guard can be used on a particular job. As such, the duty to provide adequate point of operation safeguards was with FC&S.

We recognize that *Volter v. C. Schmidt Co., Inc.* (1991), 74 Ohio App.3d 36, 41, 598 N.E.2d 35, 38–39, stated "we are aware of no Ohio precedent establishing, as a rule of law, that an employer's OSHA violation for failure to equip a machine with safety devices relieves a manufacturer of strict liability." Wysong is not automatically relieved of liability because FC&S had the duty to provide adequate safeguarding. In this case, however, in addition to the duty being with FC&S to provide adequate safeguarding, there is evidence that Wysong complied with all applicable safety and industry standards. Accordingly, we find appellants' arguments concerning negligent design not well taken.

■ We further find that the press was not defective due to inadequate warning or instruction. The pertinent warnings at issue stated, "NEVER PLACE ANY PART OF YOUR BODY AT THE POINT OF OPERATION (UNDER THE RAM OR WITHIN THE DIE AREA)" and "NEVER OPERATE MACHINE WITHOUT PINCH POINTS GUARDED AND WITHOUT ADEQUATE POINT OF OPERATION SAFEGUARDING." R.C. 2307.76 states:

"(A) Subject to divisions (B) and (C) of this section, a product is defective due to inadequate warning or instruction if either of the following applies:

"(1) It is defective due to inadequate warning or instruction at the time of marketing if, when it left the control of its manufacturer, both of the following applied:

"(a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;

"(b) The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm."

■ "A warning is adequate if it reasonably discloses all inherent risks, and if the product is safe when used as directed." *Phan v. Presrite Corp.* (1994), 100 Ohio App.3d 195, 200, 653 N.E.2d 708, 711, citing *Crislip v. TCH Liquidating Co.* (1990), 52 Ohio St.3d 251, 255, 556 N.E.2d 1177, 1180–1181.

Obviously, if appellant had never placed his hand within the die area, he would not have been injured. Additionally, it is undisputed that the warnings were displayed on the front of the press, directly in front of the operator, at eye level. Ryan testified that he noticed the warning label every time he operated the press.

With respect to the point-of-operation warning, appellants assert that there was a genuine issue of material fact regarding the adequacy of the warning

because it is unclear whether the warning meant anything to appellant. Additionally, according to appellants, the warning was inadequate because it "meant nothing" to even Ryan, who had greater experience on the press. We disagree.

Wysong clearly knew the risk associated with a lack of point of operation guarding and warned against it. Ryan, Knak, and Brickner all testified that they knew of this warning. Knak and Brickner simply never discussed the implementation of point-of-operation guarding. Had FC&S instituted adequate point of operation safeguarding, as instructed on the warning label and in the safety manual, appellant's injury would not have occurred. Accordingly, we find that the warnings were adequate.

Based on the foregoing, we find that appellants failed to establish a genuine issue of material fact concerning whether the press was defective in design, formulation, or with respect to its warnings. Because we find that summary judgment was properly granted in Wysong's favor, we additionally find that the trial court properly denied appellants' motion for reconsideration. Appellants' second and fifth assignments of error are found not well taken.

## C. APPELLANT'S CLAIMS AGAINST LINEMASTER

Appellants also claimed that Linemaster's foot pedal was defective. The trial court denied Linemaster's motion for summary judgment regarding appellants' claim that the pedal was defective in design and manufacture but granted Linemaster summary judgment regarding the adequacy of Linemaster's warnings.

A product is defective due to inadequate time-of-marketing or post-marketing warning if the manufacturer knew or should have known of a risk associated with the product, but failed to provide adequate warning or instruction given the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm. R.C. 2307.76. A component manufacturer has the obligation to warn of the dangers associated with a known specific use of the component. *Phan*, 100 Ohio App.3d at 200, 653 N.E.2d at 711. As stated above, "[a] warning is adequate if it reasonably discloses all inherent risks, and if the product is safe when used as directed." *Id.*

A manufacturer is negligent when it knows of a latent defect which renders a product unsafe and fails to provide a warning. *Temple v. Wean United* (1977), 50 Ohio St.2d 317, 325, 4 O.O.3d 466, 470, 364 N.E.2d 267, 272. However, it is "futile to require that [a manufacturer] notify the employee of that which the responsible party, the employer, was already aware." *Id.* Furthermore, in order to recover for his injuries, an employee must demonstrate that the alleged

defective warning was a direct and proximate cause of his injuries. *Id.* at 321, 364 N.E.2d at 270–271.

DiBonaventura testified that this model of foot pedal was manufactured with the following warning:

"WARNING

"THIS FOOT SWITCH SHOULD ONLY BE USED WHERE POINT OF OPERATION GUARDING DEVICES HAVE BEEN PROPERLY INSTALLED SO THAT IT IS IMPOSSIBLE FOR THE OPERATOR'S HANDS OR FINGERS TO REMAIN WITHIN THE POINT OF OPERATION DURING THE ACTUAL MACHINE CYCLE."

Obviously, DiBonaventura could not state whether this particular pedal displayed this warning and, at the time of appellant's accident, the warning was not on the foot pedal. Knak, however, testified that originally there was written material on the foot switch, but because the "emblems" got abused so bad, he would not look at them "so much." Additionally, he could not recall the content of the written material.

From appellant's perspective, we fail to see how the absence, presence, or content of the warning of the foot pedal had any part in appellant's accident. Appellant testified that the foot pedal was not depressed by him at the time the press unexpectedly cycled on him. Additionally, he testified that he never looked at the foot switch to see what may have been written on it:

"Q. Did you ever look at the foot switch to see what may have been written on it before your accident?

"A. No. Like I said, I didn't inspect the whole machine, and I just did what I was told and how it was shown to me."

Taken together, we find that appellant failed to establish any proximate causation between the lack of warning on the foot pedal and his injury. While proximate cause is often a jury question, summary judgment is proper on this issue when appellant has failed to meet his burden to produce evidence to challenge unfavorable evidence already in the record. See *Phan*, 100 Ohio App.3d at 201, 653 N.E.2d at 711–712.

Moreover, as discussed below, the warning on the press itself was sufficiently broad to encompass the content and nature of the missing foot pedal warning. The press warning was present at the time of appellant's injury and, if read by appellant, would have similarly warned appellant that the press should be operated with adequate point of operation guarding.

Appellant, however, was not responsible for assessing and providing adequate point of operation guarding; rather, that was the responsibility of FC&S. Accord-

ing to DiBonaventura, the foot pedal would have had the warning at the time the press was installed. There is no evidence to the contrary. If the warning had been present on the foot pedal at any time, it would have provided FC&S with adequate warning. See *Phan, supra,* at 200, 653 N.E.2d at 711.

 Even if the warning had not been present on the foot pedal at the time of installation, we find that no additional foot pedal warning was necessary due to the presence of the warnings on the press itself. Despite appellant's argument to the contrary, the warning prominently displayed on the press that stated, "NEVER OPERATE MACHINE WITHOUT PINCH POINTS GUARDED AND WITHOUT ADEQUATE POINT OF OPERATION SAFEGUARDING," effectively encompassed the warning that normally was placed on the model of foot pedal in question. Accordingly, it was unnecessary for Linemaster to notify FC&S of that which it was already aware. See *Temple,* 50 Ohio St.2d at 325, 4 O.O.3d at 470–471, 364 N.E.2d at 272–273.

 Appellants focus on Knak's testimony that had he known of the Linemaster warning he "maybe * * * would have done something at least different, something [where appellant could not] have his hand there at all." We, however, agree with the trial court that this statement is mere conjecture and speculation and is not supported by the facts. It is well established that speculation is insufficient to create a genuine issue of material fact in order to withstand summary judgment. *Rowe v. Pecina* (Feb. 24, 1995), Lucas App. No. L–94–266, unreported, 1995 WL 75294; *Smith v. Peoples Serv. Drug Store* (June 7, 1991), Lucas App. No. L–90–311, unreported, 1991 WL 97320. It is undisputed that if FC&S had installed adequate point of operation guarding, as instructed by the written warning on the press, appellant could not have reached within the press's die area. FC&S knew of this warning and knew it was dangerous to place any part of one's body in the die area, yet it still did not take action. Hence, it is pure speculation that anything would have been done differently regarding point-of-operation safeguarding had Knak known of this additional warning on the foot pedal.

Accordingly, we find that appellant failed to establish a genuine issue of material fact regarding the adequacy of Linemaster's warning. Having found that summary judgment was appropriately granted, we find that the trial court also properly denied appellants' motion for reconsideration. Appellants' third and sixth assignments of error are therefore found not well taken.

On consideration whereof, the court finds substantial justice has not been done the party complaining and the judgment of the Lucas County Court of Common Pleas is reversed as to FC&S and affirmed as to Wysong and Linemaster. This

matter is remanded to the trial court for further proceedings in accordance with this decision. Each party is ordered to pay their own court costs of this appeal.

*Judgment affirmed in part*
*and cause remanded.*

HANDWORK and SHERCK, JJ., concur.